STATE of Tennessee, Appellee,

v.

Robert SPURLOCK, Appellant.

No. 01–C–01–9205–CC–00167.

Court of Criminal Appeals of Tennessee, at Nashville.

May 20, 1993.

Rehearing Denied Aug. 5, 1993.

---

Charles W. Burson, Atty. Gen. and Reporter, Kimbra R. Spann, Asst. Atty. Gen., Nashville, Lawrence Ray Whitley, Dist. Atty. Gen., Jerry R. Kitchen, Asst. Dist. Atty. Gen., Gallatin, for appellee.

Lionel R. Barrett, Jr., John G. Oliva, Jr., Nashville, for appellant.

## OPINION

JONES, Judge.

The appellant, Robert Spurlock, was convicted of murder in the first degree by a jury of his peers. The jury sentenced the appellant to life in the Department of Correction.

The appellant contends that his constitutional rights to due process of law and a fair trial were violated because the State of Tennessee failed to furnish him exculpatory evidence within the meaning of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He further contends that the failure of the State of Tennessee to furnish this same material when timely requested violated Rule 26.2, Tenn.R.Crim.P., commonly referred to as the Tennessee Jencks Act. The appellant argues that the State's violations of *Brady* and Rule 26.2 were so blatant that the prosecution against him should be dismissed. In the alternative, the appellant asks this Court to grant him a new trial.

The judgment of the trial court is reversed; and this cause is remanded to the trial court for a new trial. This Court is of the opinion and finds that the State of Tennessee deprived the appellant of due process of law and a fair trial by failing to furnish the appellant with exculpatory evidence that was in its possession or the possession of the

Sumner County Sheriff's Department. The State of Tennessee also failed to correct the false testimony given by a material state witness; and the state further used false evidence in its case in chief. The appellant's contention that the action of the State of Tennessee violated Rule 26.2, Tenn.R.Crim. P., is rendered moot.

On the morning of February 21, 1989, an employee of the Sumner County Highway Department found the body of Lonnie Malone in a concrete culvert while working on Bug Hollow Road. The cause of Malone's death was the excessive loss of blood caused by stab wounds to the neck and chest. One of the stab wounds severed an artery.

The Sumner County Sheriff's Department immediately suspected that Ronnie Marshall and the appellant killed Malone. The deputies theorized that Marshall and Malone sold drugs for Spurlock. When Malone failed to pay for the drugs that he had received, Spurlock decided to kill him. According to the State, Marshall aided and abetted the appellant in the killing of the victim. Marshall supposedly found Malone, delivered him to Spurlock, and Marshall was present when Spurlock killed the victim.

When the Sumner County Sheriff's Department attempted to contact Marshall on the morning of February 22, 1989, it was discovered that Marshall had travelled to Fort Walton Beach, Florida a few hours after Malone was murdered. Marshall subsequently learned that the sheriff's office was looking for him. He voluntarily returned to Gallatin. Marshall denied that he killed the victim or that he aided and abetted Spurlock in the killing of the victim. Marshall was convicted of murder in the first degree in a separate trial; and the jury sentenced him to life in the Department of Correction. On appeal this Court reversed Marshall's conviction and remanded the cause to the trial court for a new trial. *State v. Marshall*, 845 S.W.2d 228 (Tenn.Crim.App.1992).

The Sumner County Sheriff's Department searched Spurlock's residence and motor vehicles on February 22, 1989, under color of a search warrant. The deputies executing the warrant did not find any evidence that linked Spurlock to the murder. The deputies did discover records that linked Spurlock to drug trafficking. Nothing was found in the motor vehicles that indicated an act of violence had occurred inside either vehicle.

The State established during the trial that Ronnie Marshall and Lonnie Malone were selling marijuana for Spurlock. Both Marshall and Malone were indebted for the marijuana they had received from Spurlock. Approximately two weeks prior to Malone's murder Spurlock attempted to find him. On one occasion he went to the home of Teresa Malone. When Spurlock discovered that the victim was not at the residence, he told those present that if the victim did not pay him promptly, he was going to take the victim to "the country and beat him up." On another occasion he told a friend of the victim that if the victim "mess[ed] up his money, ... he was going to beat him [the victim] every day until he got his money and he would kill anybody who messed with his money." Later, Spurlock told this same friend that he was going to kill the victim. On the date in question Spurlock told another friend of the victim that if Malone didn't pay the debt, he would be "pushing up daisies."

Henry Junior Apple testified that Spurlock and Marshall approached him on the evening of February 20, 1989. According to Apple, Spurlock wanted to know if he had seen Lonnie Malone. Apple told Spurlock that he had not seen Malone. Spurlock then asked Apple if he wanted to drink beer with them. Apple responded in the affirmative; and Spurlock told Apple to get into the car, a gray Escort. Apple got into the back seat of the vehicle. As they rode through Gallatin, they saw Malone walking along a roadway. Malone got in the back seat of the vehicle after being invited to drink beer with Spurlock, Marshall, and Apple. As they drove toward Bug Hollow Road in rural Sumner County, Spurlock asked Malone if he had the money that he owed him. Malone told Spurlock that he did not have the money, but he would borrow it from his uncle. Spurlock told Malone that he wanted his money then. When they got to Bug Hollow Road, Apple was told to get out of the car because the others did not want Apple to know where the illicit drugs were kept. Spurlock gave Apple

one-fourth of an ounce of cocaine and drove away. Apple admitted that he was already "high" from the ingestion of cocaine. He stated that he "snorted" two lines of cocaine while waiting for Spurlock to return.

Apple testified that he heard two screams approximately fifteen minutes after he exited the vehicle. A short time later, Spurlock returned in a blue pickup truck. Apple got into the truck and offered to return the cocaine, but Spurlock told him to keep the cocaine because "we've got plenty up here, we're having a party." When Apple asked where Marshall and Malone were, Spurlock said that they were at the party. Spurlock showed Apple undergarments worn by women. Apple testified that there was a pistol on the seat of the truck; and there was blood on Spurlock's shirt. Apple was taken to a store in Gallatin. When he exited the truck, Spurlock told him not to tell anyone where he had been. Spurlock supposedly told him that he would be sorry if he revealed where he had been.

## I.

Defense counsel made a timely request for exculpatory evidence in the possession of the district attorney general or a law enforcement agency participating in the investigation of the Malone murder. An assistant district attorney general advised counsel: "There is no exculpatory or mitigating evidence known to the State at this time." The response concluded: "I believe this is all the discovery in this case, but if additional discovery becomes available you will be advised promptly." The state never furnished any exculpatory evidence to defense counsel. During the hearing on the amended motion for a new trial, the deputy who investigated the Malone murder testified that no one from the district attorney general's office made inquiry about or otherwise discussed the existence of exculpatory evidence in the possession of the Sumner County Sheriff's Department.

Since Malone's body was discovered in rural Sumner County, the Sumner County Sheriff's Department investigated Malone's murder. Numerous witnesses were interviewed. Some of these witnesses identified Robert Thomas "Astro" Coats as the person who either killed Malone or participated in the murder. Coats admitted to one person that he had killed Malone.

Coats left the Gallatin area and went to Florida with Mary Skinner shortly after Malone's body was discovered. Thomas Wayne Dyer, Skinner's nephew, was living in Florida. Coats told Dyer:

"Astro" stated that he killed a guy named "Shitty." [Malone's nickname]. "Astro" stated that he cut his throat and left him in the hollow. Coats told Dyer that this fellow owed him some money and he did not have it. Coats told Dyer that he picked up [Malone] and they went riding and were doing drugs and they went to Bug Hollow Road. They got out of the car to use the bathroom and Coats says that he stabbed [Malone]. Coats said that there was blood all over his car and he had to clean it up. Dyer also states that Coats showed him the knife that he said he killed [Malone] with. It was a lock blade type knife. Also Dyer says that Coats told him not to say anything to anyone about what he said.

Dyer was interviewed by the Sumner County Sheriff's Department on May 9, 1989.

Mary Skinner was Coats' girlfriend. She was interviewed by the Sumner County Sheriff's Department on May 15, 1989. She told the deputy who interviewed her that Coats and Joe Neal Bohannon would go to the north side of Gallatin and "cop" dope. She further related that Coats "would carry an ounce or half ounce of pot to the north side and go back a while later and pick up his money or parts of it." On one occasion Coats told Skinner that "a black guy owed him some money," but he "would never say who or how much." When Coats decided to leave Gallatin, he told Skinner that "he was afraid there [were] some sealed indictments on him coming from the grand jury for selling pot and cocaine." Coats abandoned a truck, which he left on the side of a roadway, and his furniture in his haste to leave Gallatin.

Coats told Skinner that he had talked to someone in Gallatin and was told that a friend of his had been interviewed by the sheriff's department and that "there were

warrants on him for the murder of [Malone]." He also told her: "You know you are my alibi on the murder deal." When asked if Coats was capable of murdering a person, Skinner told the deputy: "Hell, yes. He would do anything if the price was right;" and "she would not put anything past them [Coats and Joe Neal Bohannon] if they got messed up on cocaine."

Elizabeth Burba was interviewed by the Sumner County Sheriff's Department on April 12, 1989. She related to the deputy who interviewed her that during the first part of March, 1989, Coats told her that "he 'cut a mother fucker's neck,' then ... he threw him in the culvert." When she asked Coats about the incident, he told her that the victim "owed him some money for cocaine and that he had been trying to avoid him." Coats answered in the affirmative when she asked if the person he cut was Malone. She then told Coats that she did not want to discuss the matter further.

Christy Angela was interviewed on April 24, 1989. She was told by William Clariday that "a friend of his ... was involved in the Malone killing." He gave a physical description that fit Coats. She also related a conversation with Andrina Barksdale.

Marilyn Whitaker was interviewed on April 24, 1989. She told the deputy who interviewed her that she knew Coats had left his pickup truck parked along a road in Buttermilk Hollow. The truck was subsequently towed to a garage in Gallatin. Her father, Sam Mitchell Whitaker, told her that "Coats and Joe Neal Bohanon (sic) had killed the boy up toward Portland."

Bill Anderson, Coats' employer, was interviewed on April 19, 1989. He related that Coats came to his place of business on March 2, 1989, obtained his pay check, and never returned to work. Coats' mother called Anderson looking for her son. She subsequently called Anderson and told him that Coats was in Florida. Anderson also told the officer he had heard that Mary Skinner, Coats' girlfriend, "had provided financial backing to Lonnie Malone for a drug deal maybe as much as Ten Thousand Dollars ($10,000.00) and that when Lonnie got the money he never came back." Anderson further stated: "[A]fter Lonnie had ripped off the money, Joe Neal Bohannon had gotten Lonnie into the car...." He did not know what happened after that.

The investigating officers learned that Coats sold his motor vehicle to a salvage yard in Baldwin County, Alabama. Sumner County authorities asked the Baldwin County Sheriff's Department to locate the car and determine if the interior of the vehicle contained traces of blood. Lt. Briar's investigation revealed that the vehicle had been repaired and sold to a couple living in Spanish Fort, Alabama. Briar located the vehicle, searched its interior, and was unable to see traces of blood. However, there was a peculiar odor inside the vehicle which Briar recognized as the "odor of decaying blood." He described it as "a remarkable smell that is easily remembered."

Coats was interviewed on May 19, 1989. He denied knowing the victim and denied telling anyone that he killed the victim. He told the officer interviewing him that "he told Mary Skinner ... she was with him ... [and] she knew she was with him at ... Coats' house in Buttermilk Hollow the night Malone was killed."

Statements were also taken by the Sumner County Sheriff's Department that named the "Bandys" as the individuals who killed Malone. Supposedly, Marshall and Malone sold cocaine furnished by the Bandys and both were heavily indebted to the Bandys.

Kenny Driver was interviewed on March 2, 1989. Earlier that day he had spoken to an unidentified female who told him: "[O]ne of the Bandys ... picked up Lonnie's brother-in-law, rode around and picked up Lonnie [Malone] and carried him to Bug Hollow Road where the rest of the gang was waiting. They killed Lonnie right there in front of Ronnie [Marshall] to make an example out of him to Ronnie—'that's what happens when you don't pay you[r] money.'" According to Driver, the Bandys were "fronting" cocaine to Malone; and Malone owed the Bandys more money than he owed Spurlock.

John D. Coarsey, a Hendersonville police officer, received information concerning criminal activity in Sumner County from Henry

Junior "Skully" Apple, "fairly regularly." On April 27, 1990, he received information from a confidential informant that "Apple had made statements that he had information and was present at the time" Lonnie Malone was murdered. Coarsey contacted Danny Satterfield, a Sumner County deputy sheriff. Satterfield was one of the deputies that had investigated the Malone murder. That evening Coarsey and Satterfield interviewed Apple at the Sumner County Jail. Apple was serving a jail sentence for "child support."

Coarsey told Apple he had information that he, Apple, was present when Malone was murdered. Apple vehemently denied that he was present when Malone was murdered. During the interview, Coarsey told Apple: "Put it all on the table, we got it worked out, that's your salvation." Apple continued to deny that he was present when Malone was murdered. Later, Coarsey told Apple "we'll help you if you tell all that you know." Again, Apple denied being present. He told Coarsey: "I don't know [how Malone was murdered]. I am telling you the truth." At another point Apple told Coarsey: "I wasn't there. I wasn't there, that's the truth. I'm not lying to you. I wasn't there."

During the course of the interview, Coarsey said that he knew Apple was scared. However, if Apple would tell him what he knew, he would get Apple "federal protection or protection. Get you, your family, everybody, out of here [out of town]" until the trial. He also told Apple that, depending upon the nature of his testimony at the trial, the authorities would change his identity, move him and his family to another town, and that he could start a new life. Apple told Coarsey: "I want to go home. I want to go home." Coarsey replied that it could be "worked out" if Apple would tell what he knew about the murder. He told Apple that he would get the district attorney general to get him out of that "hole" if he would tell him what he knew. Apple continued to deny that he was present when Malone was murdered. When Apple stated that he was "telling the truth," Coarsey stated: "That's what I am trying to get you to do [tell the truth] so I can help you." Apple responded by saying: "I don't want to go back to the jailhouse, man." Coarsey replied: "Well, let's see what we can do."

Apple eventually succumbed to the pressure that had been applied by Coarsey. He told Coarsey and Satterfield what he knew about the night in question. As Satterfield was taking a written statement from Apple, Coarsey entered the room and told Apple that he had called the district attorney general. He then stated: "Ray Whitley is getting ready to head out of town. He is going to put on some clothes, and he is enroute to this office now. Ray personally is coming, and Ray personally is going to handle it. Based on what has taken place here tonight, he is going to get you and your family some help, protection, and said he is backing it a hundred percent." He indicated that the assistance was contingent upon Apple telling General Whitley what he had told the officers. Apple responded by saying: "I hate to go back to jail." Satterfield told Apple that they could discuss his release with General Whitley when he arrived.

After General Whitley arrived at the jail, a video tape recording was made of Apple making a statement. Whitley and Satterfield asked questions during the interview. Apple stated that he had never told anyone else what he knew about the murder. A deputy sheriff reminded him that he had told his "old lady." When the statement was concluded, Apple discussed his release from jail with Whitley. Whitley knew the precise number of days Apple had left to serve on his sentence. While Whitley did not agree to obtain Apple's release, he nodded his head in the affirmative as they discussed the matter.

Between Friday, April 27, 1990, the date the audio and video tapes were made, and Monday, April 30, 1990, the date the last statement was given, a deputy sheriff had a discussion with Apple at the jail. The deputy told him: "Like I say, I talked to Sarge and he's ready to cut you loose tomorrow before I get back, first thing in the morning when he gets in, he's gonna come back here and talk to yourself. Just be cool! Everything'll be all right." It is believed that this conversation took place on Sunday, April 29, 1990.

On April 30, 1990, Apple gave a detailed statement which incriminated Spurlock. This statement was given to defense counsel. Apple was released from jail after giving the statement.

During the April 30th interview, Satterfield asked Apple: "Have you told him, anybody what happened that night?" Apple responded: "I ain't never told anybody. Only the person I've told what happened is you and Denver Howell and last night, yes, last night I got worried and worrieder they had me in a hole and I called Mr. Gibbs, the guard ... And I told him." He further stated that the guard tried to get in touch with Satterfield.

Defense counsel was not advised that Apple had been released from jail after making the statement. General Whitley instructed one of his assistants to obtain Apple's release. The assistant contacted the general sessions judge who had confined Apple to jail, and the judge ordered Apple's release.

Defense counsel became aware of the foregoing statements and events post-trial. In response to a question asked by this Court during oral argument, counsel for the appellant stated that a law enforcement officer furnished the statements to him after the trial had concluded. Based on the record presented to this Court, it appears that the officer was not authorized to furnish the material to counsel.

## II.

### A.

■ In the landmark case of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court ruled that the prosecution has a compelling duty to voluntarily furnish the accused with any exculpatory evidence that pertains to (a) the guilt or innocence of the accused and/or (b) the punishment which may be imposed if the accused is convicted of a criminal offense.[1] The Court said in *Brady*

that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 219. Thus, four prerequisites must be present before the prosecution is required to furnish the accused with "exculpatory evidence." First, the evidence must be material. Second, the evidence must be favorable to the accused, his defense, or the sentence that will be imposed if found guilty. Third, the state suppressed the evidence. Fourth, the accused must make a proper request for the production of the evidence, unless the evidence, when viewed by the prosecution, is obviously exculpatory in nature and will be helpful to the accused. *See United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Aqurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland, supra; Strouth v. State*, 755 S.W.2d 819, 828 (Tenn.Crim. App.1986).

■ The prosecutor's duty to disclose is not limited in scope to "competent evidence" or "admissible evidence." The duty extends to "favorable information" unknown to the accused. *United States v. Gleason*, 265 F.Supp. 880, 886 (S.D.N.Y.1967). In *Branch v. State*, 4 Tenn.Crim.App. 164, 469 S.W.2d 533 (1969), the accused contended that the victim had a knife, chased him from a cafe, and the accused shot the victim in self-defense. A citizen found a knife in the area where the killing occurred and gave it to law enforcement officers. The prosecution did not reveal the discovery of the knife to the accused. In reversing the accused's conviction, this Court said:

That information could very well have enabled defense counsel to conduct further and possibly fruitful investigation regarding the finding of the knife. The mere fact that the police did not get the name of the

---

1. Specific provisions for the disclosure of exculpatory evidence have been included in the American Bar Association Standards of Criminal Justice, *The Prosecution Function*, Standard 3–3.11(a) and *Discovery and Procedure Before Trial*,

Standard 11–2.1(c); the National Advisory Commission Standards, NAC, Courts 4.9; and the National Prosecution Standards, NDAA, National Prosecution Standards 13.2(C).

person who delivered the knife to them could not in any way affect the duty of the Assistant District Attorney General to inform the defendant or his counsel of the fact.

It is, therefore, no answer to say, as the State insists, and as the Assistant District Attorney General argued before the trial court, that the State's information about the knife turned in to the police department was hearsay and inadmissible in evidence on that account.

\* \* \* \* \* \*

The nondisclosure and suppression of evidence or information favorable to the defense, or which might be useful to the defense, even though there is no showing of the prosecution's bad faith, offends those fundamental constitutional concepts of a fair trial so essential to due process of law.

4 Tenn.Crim.App. at 168, 173, 469 S.W.2d at 534, 536.

### B.

■ When an accused alleges that he has been denied a constitutional right, the accused must prove the constitutional deprivation by a preponderance of the evidence. This standard of proof applies when it is alleged that the district attorney general has suppressed exculpatory evidence, has failed to correct the known false testimony of a prosecution witness, or has used false evidence to convict the accused. *See Smith v. State,* 757 S.W.2d 14, 19 (Tenn.Crim.App. 1988), perm. to appeal denied, July 25, 1988. Thus, Spurlock was required to establish by a preponderance of the evidence that he was denied access to exculpatory evidence or favorable information, that the district attorney general failed to correct the known false testimony of Apple, and that the district attorney general used false evidence to convict him. This Court is of the opinion and finds that Spurlock established these constitutional deprivations by a preponderance of the evidence. Moreover, the evidence contained in the record clearly preponderates against the findings of fact made by the trial court.

### C.

The concurring opinion reasons that experienced lawyers may differ based on the facts contained in the record. This opinion states: "Some would find the prosecutor's conduct wrong. Other would simply view the conduct as commensurate with the sporting theory of justice. According to legal scholars, such a theory is an anachronism in Tennessee and is dead. As a practical matter, this type of legal combat is still alive in our courtrooms; and it is practiced by both sides—prosecution and defense." In *State v. Gaddis,* 530 S.W.2d 64, 69 (Tenn.1975), the late Mr. Justice Henry stated: "The days of trial by ambush are numbered. Rapidly fading is what Dean Pound described as the 'sporting theory of justice.'" The issue in *Gaddis* was the right of the accused to have his expert test the illicit drugs that formed the nucleus of the indictment returned against him. Justice Henry was making reference to the proposed Tennessee Rules of Criminal Procedure, which became law post-*Gaddis* on July 13, 1978. No appellate court in this state has ever held that the constitutional rights of an accused can be the subject of the "sporting theory of justice."

■ *Gaddis* rang the death knell for the "sporting theory of justice." If this theory is presently being used to deprive the accused of constitutional rights as the concurring opinion suggests, this Court is willing to bury that theory today. Such a theory cannot be used to justify the deprivation of a constitutional right.

The concurring opinion's attempt to equate the conduct of defense lawyers and district attorney generals practicing in the criminal arena of justice is not supported by the law or the Code of Professional Responsibility. The opinions of the United States Supreme Court, the appellate courts of this state, and the Code of Professional Responsibility place defense lawyers and district attorney generals on different pedestals. While the Code of Professional Responsibility governs the conduct of defense counsel and district attorney generals, the very nature of their representation requires different treatment.

In *State v. Fields*, 7 Tenn. 140, 145–146 (1823), the Court referred to the district attorney general in the following manner:

> In a State case the people prosecute and the Attorney–General is their officer; he is created by the Constitution, acts in virtue of his commission, and on oath; and while he guards with vigilance the interest of the State, it is his bounden duty to see that such rights as the accused has shall not be prostrated, but that right and justice shall be done; he should not lay hold of an accident brought upon the accused by a default not imputable to her, and turn such accident to the purpose of illegal conviction; for as the people, the members of whom such an abuse might fall indiscriminately, would, for the safety of each, avert such a course; so neither should the Attorney–General, acting for them, stand by and see toils improperly spread to ensnare any.

In *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935), the United States Supreme Court stated:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods as it is to use every legitimate means to bring about a just one.

*Berger* was cited with approval in *Judge v. State*, 539 S.W.2d 340, 344–345 (Tenn.Crim. App.1976).

The district attorney general has an ethical duty to furnish an accused with exculpatory evidence or favorable information, to correct false testimony given by a prosecution witness, and to refrain from using false evidence to convict an accused. Tennessee Code of Professional Responsibility EC 7–13, 7–26 and 7–27; DR 7–102, 7–103, and 7–109. *See* J. Hall, *Professional Responsibility of the Criminal Lawyer,* Section 7.17 (1987).

Ethical Consideration 7–13 provides in part:

> The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict.... With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice; the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecutor's case or aid the accused.

Thus, DR 7–103(B) provides: "A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment." DR 7–109(A) provides that "a lawyer shall not suppress any evidence that he or his client has a legal obligation to reveal or produce." *See* A.B.A. Standards for Criminal Justice, *The Prosecution Function,* Standard 3–3.11(a).

EC 7–26 states that "[t]he law and Disciplinary Rules prohibit the use of fraudulent, false, or perjured testimony...." EC 7–27 states that "a lawyer should not suppress evidence that he or his client has a legal obligation to reveal or produce." Thus, DR 7–102(A)(3) and (A)(4) provide that a lawyer should not "(3) [c]onceal or knowingly fail to disclose that which he is required to reveal" or "(4) [k]nowingly use perjured testimony or false evidence."

■ In summary, a district attorney general has both a legal as well as ethical duty to furnish the accused with exculpatory evi-

dence or favorable information; and he has both a legal and ethical duty to refrain from suppressing such evidence, to correct the false testimony of a prosecution witness, and to refrain from using false evidence to convict an accused.

## III.

### A.

█ When an individual other than the accused has a motive to commit the very same crime for which the accused has been charged, the accused may prove by competent evidence that there was another individual who was inclined to commit the offense. *Green v. State*, 154 Tenn. 26, 285 S.W. 554 (1926); *Sawyers v. State*, 83 Tenn. 694 (1885); *State v. Kilburn*, 782 S.W.2d 199, 204–205 (Tenn.Crim.App.1989); 21 Am. Jur.2d *Criminal Law*, § 186. *See State v. West*, 767 S.W.2d 387, 395–396 (Tenn.1989), *cert. denied*, 497 U.S. 1010, 110 S.Ct. 3254, 111 L.Ed.2d 764 (1990); *Montesi v. State*, 220 Tenn. 354, 417 S.W.2d 554 (1967); *State v. McAlister*, 751 S.W.2d 436, 439 (Tenn. Crim.App.1987). In *Sawyers*, a murder prosecution, the accused attempted to introduce evidence that another individual had a motive to kill the victim. The trial court ruled that this evidence could not be introduced by the accused. In reversing the trial court, the Supreme Court said:

> The defense offered to prove that [the] deceased had instituted criminal proceedings against two other persons for robbery, which was rejected on objection of the State. It is a rule of law that the guilt of the accused must be made out to the exclusion of every other reasonable hypothesis. If there is proof in the possession of an accused tending to show that another had the motive, or was in condition to be acted upon by causes which might produce the motive to commit the offense, such facts may be shown as items of proof tending to establish a motive in the breast of such other person, and to that extent prove the existence of an hypothesis inconsistent with the guilt of the prisoner, the value of such evidence to be determined by the jury, who should give to it any such weight as its surroundings might justify.

83 Tenn. at 695. In *Green,* also a murder prosecution, the accused offered evidence to establish that another person had a motive to kill the victim, as well as the reason for the motive. The trial court ruled that the evidence was not admissible. The Supreme Court, citing *Sawyers* and other decisions, reversed the accused's conviction, holding that the evidence should have been admitted into evidence. *Green,* 154 Tenn. at 32–34, 285 S.W. at 556.

This Court followed *Green* in *Kilburn, supra,* where this Court reversed a first degree murder conviction because the trial court excluded evidence offered to establish that another person had the motive and opportunity to have committed the offense. *Kilburn,* 782 S.W.2d at 204–205.

█ It is also permissible to prove that an individual other than the accused committed the very same crime for which the accused has been charged. As stated in 21 Am.Jur. 2d, *Criminal Law,* § 186 at 340: "A defendant may, by proper evidence, prove that another person committed the crime with which he is charged where the guilt of such other person is consistent with the defendant's innocence...." In *Hensley v. State,* 28 Tenn. 243 (1848), an effort was made by the accused to show that the crime in question was committed by another person. The accused was prepared to prove that the other person had threatened to commit the very act for which the accused was being tried; and the other person was in the neighborhood where the crime was committed. The trial court ruled that the accused could not introduce the evidence. The Supreme Court ruled that the trial court had committed reversible error in refusing to permit the accused to introduce the evidence in question. The Supreme Court said:

> We think the testimony offered was legitimate proof, and ought to have been heard by the jury. Surely it was a legitimate defense for the prisoner to show that another and not herself perpetrated the crime with which she was accused, and any proof would be legitimate to establish this fact, which would have been legal against the individual upon whom it is attempted

to place it, if he had been upon trial therefor. It will not be controverted that if John Richards had been upon trial for burning the mill, that proof that he had threatened to do so, and that he was in the neighborhood the night it was burned, would be legal proof of his guilt to be submitted to the jury.

28 Tenn. at 245.

The rules established in *Sawyers* and *Hensley*[2] are evidentiary rules which permit the introduction of evidence to establish that (a) another person had a motive to commit the offense or that (b) another person actually committed the offense, for the purpose of creating a hypothesis that is inconsistent with the accused's guilt. *Sawyers v. State, supra.* The weight to be given to such evidence must be determined by the trier of fact. *Sawyers v. State, supra.* If the evidence is accredited by the trier of fact, and it creates a reasonable doubt when taken into consideration with the balance of the evidence, it would be the duty of the trier of fact to acquit the accused. Conversely, if the trier of fact does not accredit the evidence, or, when considered with the remaining evidence, it does not create a reasonable doubt, it would be the duty of the trier of fact to convict the accused.

### B.

In the context of this case, the prosecution had a constitutional duty to disclose the statements which either stated or implied that Robert Thomas "Astro" Coats killed Malone to defense counsel. Representatives of the Sumner County Sheriff's Department admitted that they took the statements; and these statements were in the investigative file when this case was tried. The statements were clearly exculpatory within the meaning of *Brady v. Maryland, supra;* and the statements were material as well as favorable to the appellant.

The statements of Thomas Wayne Dyer, Mary Skinner, Elizabeth Burba, Christy Angela, Marilyn Whitaker, Bill Anderson, and the role that the Baldwin County, Alabama Sheriff's Department played in finding and examining Coats' motor vehicle should have been furnished to defense counsel prior to trial. This would have permitted defense counsel to make a thorough investigation as to whether there was competent evidence that Robert Thomas "Astro" Coats had a motive to kill Malone or whether there was competent, admissible evidence that Coats actually murdered Malone. The statements made to Dyer, Skinner, and Burba were admissible to establish Coats' guilt of the offense along with other circumstances such as Coats' flight from Gallatin. And it is possible that other facts may have been developed that implicated Coats in the murder. The fact that some of the hearsay evidence would not be admissible is irrelevant given the favorable and the material nature of the statements. *Branch v. State, supra.*

This Court has held that the state has a duty to disclose the statements of witnesses which are exculpatory or favorable to the accused. *State v. Goodman,* 643 S.W.2d 375, 379–380 (Tenn.Crim.App.1982). *See People v. Dixon,* 19 Ill.App.3d 683, 312 N.E.2d 390 (1974); *Hall v. State,* 650 P.2d 893 (Okla. Crim.App.1982). In *Goodman,* this Court held that the prosecution had a duty to disclose a statement which implied in part that the accused did not commit the murder of the deceased. 643 S.W.2d at 380. Thus, the state violated the *Brady* doctrine in refusing to disclose the statements regarding Coats to defense counsel.

### IV.

The prosecution provided defense counsel with the statements made by Henry Junior Apple on March 2, 1989, April 19, 1989, June 19, 1989, July 7, 1989, and April 30, 1990. The prosecution did not furnish defense counsel with the audio tape recording and video tape recording of April 27, 1990, or the audio tape recording referred to as the "Sarge" tape, which contained a con-

---

**2.** These rules are not defenses. Consequently, the rules are still viable notwithstanding the fact that all "[d]efenses available under common law" have been abolished. Tenn.Code Ann. § 39–11–203(e).

versation between an unknown deputy sheriff and Apple on Sunday, April 29, 1990.

The prosecution suppressed these recordings because they reflected unfavorably upon Apple's credibility. As previously stated, Coarsey had made numerous promises to Apple in an attempt to extract what he supposedly knew about the night in question. In addition, this audio tape recording contained numerous discussions concerning Apple's pressing desire to be released from the Sumner County Jail. The video tape recording also contained a colloquy between General Whitley and Apple regarding Apple's release from the jail. The "Sarge" audio tape recording contained information concerning Apple's pending release from jail. As previously noted, the deputy told Apple that "Sarge" was going to "cut him loose" the following day, April 30th. It is undisputed that Apple was released on April 30th. The prosecution knew that the information on these tapes would completely destroy Apple's testimony—the only evidence linking Spurlock and Marshall to the murder of Lonnie Malone.

Defense counsel questioned Apple at length as to why he waited fourteen months before telling Deputy Satterfield that he had been with Marshall, Spurlock, and the victim on the night in question. During the April 30th statement, the following colloquy occurred between Detective Satterfield and Apple:

> SATTERFIELD: Have you told him, anybody what happened that night?
>
> APPLE: I ain't never told nobody. Only the person I've told what happened is you and Denver Howell and last night, Yes, last night I got worried and worrieder they had me in a hole and I call Mr. Gibbs, the guard, (inaudible) you can ask him right now and he will tell you I was in there crying. I was worried, man. Me and him sat there, and he sat there for about an hour and talked to me. He said, "Henry what's on your mind?" I said, "If I tell you, you wouldn't tell nobody, would you?" And I told him. And then I went down, lay down and went to sleep and I jumped up and I called him again. Came back there again and said, "Henry, I tried to get

in touch with (inaudible) to let you talk to, 'cause you need to—

> SATTERFIELD: Who did he try to get in touch with?
>
> APPLE: He tried to get in touch with you. And he said today when he come in if I hadn't left, that he was going to tell you the same thing I'm telling ya'll on this tape, he'll tell you the same thing I told him. It just worried me and I can't stand to be locked, I can't stand to be by myself hardly.

Defense counsel, relying on this statement, believed that this statement was the first time Apple revealed the Bug Hollow Road incident to a law enforcement officer.

The following colloquy took place between defense counsel and Apple regarding the April 30th statement:

> Q. Now, on these occasions [the previous occasions when deputies interviewed Apple], you never admitted being up on Bug Hollow Road with Robert Spurlock, did you?
>
> A. Yes, I did admit it.
>
> Q. Isn't it correct, sir, the first time that you ever told anyone that you were at Bug Hollow Road was on April 30th of 1990 when you were in the jail here? That's the first time you told people, isn't it?
>
> A. No, sir.
>
> Q. All right, sir. If that was not, then when was the first time that you said that you were at Bug Hollow Road when this killing occurred?
>
> A. I didn't. Hadn't told nobody but my old lady, my girlfriend.
>
>      *     *     *     *     *     *
>
> Q. On April 30th there is a tape recording, sir, between you and Det. Danny Satterfield about this murder. Do you recall April 30th at the Sumner County Sheriff's Department giving an interview about this murder?
>
> A. Yes, sir. I talked to Danny about that, but I don't know what day it was.
>
> Q. Everybody knows apparently the date of the killing was February 20th of 1989. You have indicated, have you

not, sir, that on that occasion you were high?

A. Yes, sir, I was high.

Q. That's the first time you told anyone about Bug Hollow?

A. No, sir. I told my girlfriend, but she—I just told her.

Q. That was the first time you told authorities; right?

A. But, I didn't tell nobody else.

The answers given by Apple were clearly false. He told Coarsey and Satterfield what had occurred on the evening of April 27th. The audio tape of that date establishes this fact. Apple repeated this statement later that evening in the presence of General Whitley, Deputy Satterfield, and Deputy Denver Howell. This fact is verified by the video tape recording made on the evening of April 27th.

The portion of the April 30th statement hereinabove set forth, revealed that Apple was confined to jail when he made the statement. Defense counsel questioned Apple about his desire to be released from jail. The following colloquy took place between defense counsel and Apple:

Q. You wanted to get out of jail, didn't you?

A. No, sir. I didn't have but one day to do.

\* \* \* \* \* \*

Q. After April 30th of 1990 when you gave the first statement admitting Bug Hollow Road and your involvement, how long was it before you were released from jail?

A. I don't know. Like I told you, sir, I didn't have but one more day and I got out. I said that day I had one more day to do, and Sarge come in and I guess was being nice and let me go. I didn't have but one more day.

The responses given by Apple regarding his release from jail were clearly false. Apple bargained with Coarsey, Satterfield, and Whitley regarding his release from jail. This is verified by the audio tape recording and video tape recording of April 27th. These tapes reveal Apple's burning desire to be released from jail. The audio tape recording of April 29th revealed that arrangements had been made to' release Apple the following day. Whitley instructed an assistant district attorney general to obtain Apple's release. A general sessions judge released Apple from serving the balance of his six month sentence at the request of the assistant district attorney general. The fact that Apple was released on April 30th after giving the statement to Satterfield is not disputed.

During redirect examination, the state reinforced Apple's testimony, which it well knew was false. The following colloquy occurred during redirect examination:

Q. Now, Mr. Apple, what caused you— what was on your mind when you decided to tell Det. Satterfield, who is sitting here? What was on your mind when you decided to tell him what you knew about this case?

A. Well, I got kindly—when his mama and them passed me, they wouldn't speak to me. So, she always had—we always had been good friends, and I knew.

Q. What you're testifying to today is the truth?

A. Yes, sir.

\* \* \* \* \* \*

Q. Have you been promised anything by the State of Tennessee or the Sumner County Sheriff's Department?

A. No, sir.

Q. About your testimony, about anything?

A. No, sir.

The prosecution knew that Apple had not testified truthfully. The prosecution had actual knowledge that Apple had revealed what occurred on two occasions prior to April 30th. They knew or should have known, that Coarsey had promised Apple "federal protection or protection" until the trial; and, depending upon his testimony, the authorities would change his identity, move him and his family to another community, and he could begin a new life. The state knew that Coarsey also told Apple that his release from jail could be "worked out"; and he would get the district

attorney general to remove him from the "hole," meaning the jail. Of course, Apple was released from jail following the April 30th statement; and it was General Whitley who ordered his assistant to obtain Apple's release.

General Whitley personally presented the direct examination of Deputy Satterfield. The following colloquy occurred between General Whitley and Satterfield:

Q. Have there been any promises made to Henry Apple in connection with this case?

A. No, sir, there have not.

Q. Have there been any requests made by Mr. Apple for reward or anything of any kind of nature at all?

A. No, sir, there has not.

Q. When did you first hear from Mr. Apple anything about what happened on Bug Hollow Road?

A. I interviewed Mr. Apple on April the 30th of this year, and that's when I took a taped interview from Mr. Apple and had that transcribed. Mr. Apple related to me the events that occurred at Bug Hollow.

Q. And to your knowledge, is that the first time Mr. Apple had said anything about what happened on Bug Hollow Road to police authorities?

A. Yes, sir.

Q. Had Mr. Apple been interviewed by law enforcement authorities before that?

A. Yes, sir, he had.

Q. On several occasions?

A. Yes, sir.

Q. And he never mentioned that at all?

A. That's correct.

*     *     *     *     *     *

Q. To your knowledge, is Mr. Apple getting anything by way of leniency or monetary reward or anything whatsoever in exchange for his testimony in the trial of this case?

A. No, sir.

General Whitley knew that the questions he propounded to Satterfield would elicit false testimony; and Satterfield well knew that his responses to the questions were false.

### A.

The state was constitutionally required to furnish defense counsel with the audio tape and video tape that were recorded on April 27, 1990;[3] and the prosecution was also constitutionally required to furnish defense counsel with the audio tape that was recorded on April 29, 1990. These recordings reflected the promises Coarsey made to Apple and Apple's real motivation for linking Spurlock to the events that occurred on Bug Hollow Road. They reflected that Apple's jail conversion was a hoax, that Apple first revealed the Bug Hollow incident on April 27th, not April 30th, and that the decision to release Apple from the Sumner County Jail had been made before April 30th. It is crystal clear that the content of these recordings was favorable to the appellant; and the recordings were material to an informed cross-examination of Apple since his credibility was the crucial issue in this prosecution. As previously noted, Apple's testimony was the only evidence that linked Spurlock and Marshall to the murder of Lonnie Malone. If Apple's credibility had been destroyed to the extent the jury was unwilling to believe him, the appellant would have been acquitted.

■■■ The doctrine announced in *Brady v. Maryland, supra,* extends to the statements of a prosecution witness that are material and favorable to the accused. *McDowell v. Dixon,* 858 F.2d 945 (4th Cir.1988), *cert. de-*

---

**3.** The concurring opinion states that the video tape is not exculpatory. The only portion of the video tape that is exculpatory or favorable is the discussion between General Whitley and Apple regarding Apple's desire to be released from jail. However, the video tape's value in this case is to establish that the district attorney general, the assistant district attorney general, and Deputy Satterfield were clearly aware that Apple's testimony during cross-examination and redirect examination was false; and that the district attorney general unmistakably used the false testimony of Satterfield to bolster Apple's testimony. The concurring opinion does not mention or allude to the audio tapes of April 27, 1990 and April 29, 1990.

*nied,* 489 U.S. 1033, 109 S.Ct. 1172, 103 L.Ed.2d 230 (1989) (statement of victim); *Chavis v. North Carolina,* 637 F.2d 213, 223 (4th Cir.1980) (statement of key witness); *Scurr v. Niccum,* 620 F.2d 186 (8th Cir.1980) (statements of accomplice and accomplice's mother); *Monroe v. Blackburn,* 607 F.2d 148 (5th Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1980) (statement of victim); *State v. Hall,* 174 W.Va. 787, 329 S.E.2d 860 (1985) (statement of key prosecution witness); *Dozier v. Commonwealth,* 219 Va. 1113, 253 S.E.2d 655 (1979) (statement of victim). *See State v. Goodman,* 643 S.W.2d 375, 379–380 (Tenn.Crim.App.1982). It is irrelevant that the information contained in the statements can only be used to impeach the witness. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Blanton v. Blackburn,* 494 F.Supp. 895 (M.D.La.1980), aff'd, 654 F.2d 719 (5th Cir.1981); *Rolli v. Commonwealth,* 678 S.W.2d 800 (Ky.App.1984). In *Napue* the United States Supreme Court, holding that the prosecution was required to correct a false answer given by a prosecution witness, stated:

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because *the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.*

360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d. at 1221 (Emphasis added). The Supreme Court reaffirmed this principle in both *Bagley* and *Giglio.* In *Bagley* the Court said: "This Court has rejected any such distinction between impeachment evidence and exculpatory evidence." 473 U.S. at 676, 105 S.Ct. at 3381, 87 L.Ed.2d at 490.

It is a fundamental principle of law that an accused has the right to cross-examine prosecution witnesses to impeach the credibility or establish the motive or prejudice of the witness. This includes the right to cross-examine a prosecution witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness. *See State v. Norris,* 684 S.W.2d 650, 654 (Tenn.Crim. App.1984); *State v. Hamilton,* 628 S.W.2d 742, 745 (Tenn.Crim.App.1981); *Rolli v. Commonwealth, supra.* It is irrelevant that the promises were made by a law enforcement officer who did not have the authority to bind the state if, as here, the promises induced the witness to give an incriminating statement and testify in the cause. *Boone v. Paderick,* 541 F.2d 447 (4th Cir.1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977). This would include the fact that Apple was released from jail at the request of General Whitley after making the April 30th statement. *See State v. Bailey,* 367 So.2d 368 (La.1979).

**B.**

It is a well established principle of law that the state's knowing use of false testimony to convict an accused is violative of the right to a fair and impartial trial as embodied in the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, §§ 8 and 9 of the Tennessee Constitution. *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Hall v. State, supra.*

When a state witness answers questions on either direct or cross examination falsely, the district attorney general, or his assistant, has an affirmative duty to correct the false testimony. *See Giglio v. United States, supra; Napue v. Illinois, supra; Blanton v. Blackburn,* 494 F.Supp. at 900 ("it is the responsibility of the prosecution to correct the evidence"); *Hall v. State,* 650 P.2d at 896 ("[d]ue process ... imposes an affirmative duty upon the State to disclose false testimony which goes to the merits of the case or to the credibility of the witness").

**618**

Whether the district attorney general did or did not solicit the false testimony is irrelevant. *United States v. Barham,* 595 F.2d 231 (5th Cir.1979). However, if the prosecution fails to correct the false testimony of the witness, the accused is denied due process of law as guaranteed by the United States and Tennessee Constitutions. *Giglio v. United States,* 405 U.S. at 153–154, 92 S.Ct. at 766, 31 L.Ed.2d at 108; *Napue v. Illinois,* 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221. In *Napue* the Supreme Court said:

> First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.... The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.... (Citations omitted).

*Id.* This rule applies when the false testimony is given in response to questions propounded by defense counsel for the purpose of impeaching the witness. *Giglio v. United States, supra; Napue v. Illinois, supra; Campbell v. Reed,* 594 F.2d 4, 7 (4th Cir. 1979).

■ As previously stated, Apple answered questions propounded by defense counsel falsely. Neither General Whitley, who participated in this trial, nor his assistant made an effort to correct the false testimony. General Whitley had actual knowledge that Apple had answered the questions falsely. Whitley talked with Coarsey by telephone, he was told that Apple was willing to talk, and he went to the Sumner County Jail shortly after Coarsey completed the interview. The audio tape of April 27th was in the possession of the Sumner County Sheriff's Department. Moreover, Whitley was present when the video tape was made; and he personally directed the assistant assigned to child support cases to obtain Apple's release. The April 29th tape revealed that the decision to release Apple had been made prior to the April 30th statement.

General Whitley solicited testimony from Detective Satterfield that both Whitley and Satterfield knew was false. Satterfield was present when Coarsey was pressuring Apple, or he listened to the conversation via a "wire" that was attached to a desk in the interview area. He too was present when the video tape of Apple's statement was made on April 27th. He also was involved in Apple's release from jail. Both were aware of the offers made by Coarsey on April 27th.

The solicitation of testimony known to be false, and the failure to correct the false testimony given by Apple, denied the appellant due process of law within the meaning of the United States and Tennessee constitutions.

**V.**

■ The state contends that the evidence the prosecution suppressed did not constitute "material evidence." This Court finds that the suppression of the statements regarding Coats, the failure to correct the false testimony, and the introduction of testimony known to the state to be false was material; and, if the suppressed information had been available to defense counsel, a different result would have been reached. Therefore, the appellant is entitled to a new trial.

When there has been a violation of the rules created in *Brady v. Maryland, supra, Napue v. Illinois, supra,* and *Mooney v. Holohan, supra,* the question arises: is the accused entitled to a new trial? The United States Supreme Court first broached the subject of when and under what circumstances an accused is entitled to a new trial in the case of *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *Agurs* the Court held that every suppression of evidence does not warrant the granting of a new trial. The Court said in ruling:

> [W]e cannot consistently treat every nondisclosure as though it were error. It necessarily follows that the judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless-error standard. Under that standard when error is present in the record, the reviewing judge must set aside the verdict and judgment unless his 'conviction is sure that the error did not influence the jury, or had but very slight effect.'

427 U.S. at 111–112, 96 S.Ct. at 2401, 49 L.Ed.2d at 354.

According to the holding in *Agurs,* if the exculpatory evidence or information the prosecution failed to disclose created a reasonable doubt that otherwise did not exist, constitutional error had been committed and the accused was entitled to a new trial. 427 U.S. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. However, if the evidence or information did not create a reasonable doubt as to the accused's guilt "whether or not the additional evidence is considered, there is no justification for a new trial." 427 U.S. at 112–113, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. In either instance, the "omission must be evaluated in the context of the entire record." 427 U.S. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355.

In 1985 the Tennessee Supreme Court adopted the rationale of *United States v. Agurs, supra,* in *State v. Hartman,* 703 S.W.2d 106, 114–115 (Tenn.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3308, 92 L.Ed.2d 721 (1986). *Hartman* was decided on October 28, 1985. The Court denied the petition for rehearing on January 13, 1986. On July 2, 1985, prior to the release of the decision in *Hartman,* the United States Supreme Court discarded the *Agurs* rule in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

In *United States v. Bagley, supra,* the Supreme Court, observing that the *Agurs* standard of review varied depending on the nature of the accused's request, or lack thereof, adopted a variation of the *Agurs* standard that had been formulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In ruling, the Court said:

> We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

473 U.S. at 681–682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494. The Court further stated that "[t]he reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense" been made aware of the favorable information. 473 U.S. at 683, 105 S.Ct. at 3384, 87 L.Ed.2d at 494.

Whether this Court applies the *Agurs* standard or the *Bagley* standard the result reached would be the same.

### A.

The statements taken by the Sumner County Sheriff's Department that implicated Robert Thomas "Astro" Coats, the sale of his automobile to a salvage dealer in Alabama, and the odor of decaying blood in the automobile were clearly exculpatory and favorable to the appellant. The fact that neither the statements nor the facts regarding the automobile are admissible as evidence in their present form is irrelevant. *Branch v. State, supra.* The appellant was entitled to have his counsel thoroughly investigate the allegations contained in the statements; and he was further entitled to have counsel investigate the automobile in Alabama.

These items were clearly material. Such evidence, when coupled with the exculpatory evidence that would have seriously reflected upon Apple's credibility, would have created a serious reasonable doubt as to the appellant's guilt. Therefore, the appellant is entitled to a new trial. *See People v. Dixon, supra; Hall v. State, supra.*

### B.

The testimony of Henry Junior Apple was the sole, exclusive evidence available to the prosecution to link both Spurlock and Marshall to the murder of Lonnie Malone. Prior to Apple's revelations on April 27th, 1990, and April 30, 1990, the investigating officers could not prove that their suspects, Spurlock and Marshall, actually murdered the victim. Nor could the prosecution obtain an indict-

ment charging the suspects with the murder. The indictment in this case was returned on May 9, 1990, fifteen months and seventeen days after the commission of the murder and nine days after Apple's last statement to Deputy Satterfield.

Apple gave a general description of what occurred on the night in question. Defense counsel was successful in impeaching Apple in many respects. He established that Apple made numerous statements to the officers, but he did not mention the Bug Hollow incident until April 30, 1990. He was successful in developing inconsistencies in the information Apple had given to the officers. However, he could not contradict Apple's jail conversion: why he decided to tell the officers about the Bug Hollow experience. Nor was he aware of the promises of help that Coarsey had conveyed to Apple during the initial interview on April 27, 1990.

Had defense counsel been furnished with the audio tape and video tape recordings of April 27, 1990, and the audio tape recording of April 29, 1990, he could have developed Apple's true reason for making the statement, his release from jail; and, in turn, counsel could have literally destroyed the jailhouse conversion. Moreover, the decision to release Apple from jail was made prior to April 30, 1990; and, after completing the April 30th statement, Apple was in fact released from jail. It also could have been developed that General Whitley initiated Apple's release from a six month sentence. When it was decided to obtain Apple's release, no decision had been made by the general sessions court to release Apple early. The promises made by Coarsey during the initial interview also could have been established.

The prosecution knew that Apple's testimony was crucial to its case; and, further, the prosecution knew that Apple's prior criminal record, use of illicit narcotics, sparse work record, and other factors made his credibility tenuous at best. It may be reasonably inferred from the evidence and the nature of the April 27th and April 29th recordings that the prosecution made every effort to suppress the recordings. The prosecution knew if the material contained on these tapes was conveyed to defense counsel, an extremely competent, experienced and skilled criminal defense lawyer, Apple's credibility would have been completely destroyed; and the trier of fact would not have believed Apple's testimony. In short, Spurlock would have been acquitted because the only link connecting him to the murder in Bug Hollow would be missing—the jury would not have accredited Apple's testimony.

When, as here, the testimony of the prosecution's principal witness is crucial to establish the accused's guilt of the offense in question, the suppression of highly relevant evidence that could have been used to impeach the witness is deemed material; and it is also grounds for the granting of a new trial. *See, e.g., McDowell v. Dixon,* 858 F.2d at 949 ("had the jury known of her prior inconsistent identifications [contained in statements of officers], there was a reasonable probability that the outcome of McDowell's trial might have been different"); *Campbell v. Reed,* 594 F.2d at 8 ("the jury's verdict might have been different had it known the full extent of Miller's motivation to testify against Campbell"); *State v. Hall,* 329 S.E.2d at 863 ("we conclude that the jury's verdict might have been different had the jury been allowed to hear Green's prior inconsistent statement.... [A] reasonable doubt might well have been created"); *Dozier v. Commonwealth,* 253 S.E.2d at 658 ("the suppressed evidence [prior inconsistent statement of the victim] might have affected the outcome of the trial"). This Court is of the opinion and finds that the content of the three tapes was material; and, if the content of the tapes had been provided to defense counsel, there is a strong likelihood that the jury would not have believed Apple. An acquittal would have resulted. Therefore, this violation of the appellant's constitutional right to due process of law, coupled with the other violations, warrants a new trial.

### C.

Part of the prosecution's trial tactics was to leave the impression that the first time Apple revealed his Bug Hollow experiences was April 30th. Coarsey's name was not included as a witness on the face of the

indictment. The April 27th audio and video tapes were not provided to defense counsel. Nor was the April 29th audio tape provided to defense counsel. However, Apple almost let the "cat out of the bag" by revealing that he had told General Whitley and the officers about his Bug Hollow experience. Of course, it was not clear to defense counsel, who was rightfully focused upon the April 30th statement, that Apple meant he had discussed the topic with Whitley, Satterfield, Coarsey, and Howell prior to April 30th.

The state permitted the false answers to stand uncorrected because (a) the way the questions were answered suited the state, (b) correction of the false answers would have meant that defense counsel would have learned of the tapes made April 27th and 29th, and (c) defense counsel would have never discovered that the questions were answered falsely albeit counsel might strongly have suspected the answers in reality were false. The state compounded the problem when it asked Apple on re-direct his reason for talking to authorities after his jailhouse conversion when General Whitley, who participated in the trial and was seated in the courtroom, was well aware that Apple's decision was predicated upon Coarsey's promise to have him released from jail. The prosecution further compounded the problem when it asked on re-direct if Apple had been promised anything by the state or the Sumner County Sheriff's Department "[a]bout [his] testimony, about anything?" The prosecution knew, or it was imputed to the prosecution if it did not know, that Coarsey had made numerous promises to Apple; and the one promise that Apple sought as a condition to giving the statement, his release from jail, was kept by Coarsey and the state.

The prosecution, no doubt concerned about Apple's close call in letting the "cat out of the bag," decided to eradicate any doubts that existed in the minds of the jury, the trial court, and defense counsel regarding the probability of prior statements regarding the Bug Hollow incident. This was accomplished by the false testimony of a law enforcement officer. It is common knowledge that jurors religiously believe law enforcement officers in the absence of facts that establish the testimony is unreliable. General Whitley, who presented Satterfield's direct testimony, knew that Satterfield's testimony was false. Both knew that Coarsey had made several promises to Apple, including the promise to obtain his release from jail, to obtain his statement, and, eventually, to obtain his testimony at the trial. Both knew that Apple had made the initial statements on April 27th, not April 30th, as they portrayed. Whitley and Satterfield were present on the evening of April 27th. Satterfield was present for the audio and video recordings. Whitley was present when the video taped statement was made. Whitley and Satterfield had conferred about releasing Apple from jail; and Whitley directed one of his assistants to obtain Apple's release. In addition, the decision had been made prior to April 30th.

As previously stated, false testimony and the failure to correct the false testimony of a prosecution witness are treated the same. Both deny the accused due process of law. When false testimony is material, the accused is entitled to a new trial notwithstanding the fact that the false testimony is related to matters of impeachment. *See, e.g., Giglio v. United States,* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108 (failure to correct false answer of principal witness that there was no agreement to testify in exchange for the dismissal of the prosecution against him); *Napue v. Illinois,* 360 U.S. at 269–270, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221–1222 (failed to correct false answer of principal witness that no one had made any promises in exchange for his testimony when in fact the prosecutor had promised to recommend a reduced sentence, and, if possible, effectuate it); *United States ex rel. Wilson v. Cannon,* 538 F.2d 1272 (7th Cir.1976); *State v. Brooks,* 513 S.W.2d 168 (Mo.App.1973); *Walker v. Commonwealth,* 4 Va.App. 286, 356 S.E.2d 853 (1987). In the case *sub judice,* the false testimony camouflaged Apple's credibility; and, in addition, it prevented defense counsel from receiving the devastating tapes of April 27th and April 29th. The testimony of Satterfield reinforced this false image of Apple as a witness. This, coupled with the remaining violations of the appellant's constitutional rights to a fair trial and

due process of law, entitles the appellant to a new trial.

## VI.

The concurring opinion reasons that the trial court "inferentially did not find the prosecutor guilty of criminal activity such as the majority asserts."

The trial court stated that "the failure of furnishing the *Jencks* material and *Brady* material are very bad, very wrong. It has been admitted to be." However, he erroneously ruled that the exculpatory or favorable evidence was not material.

Once the trial court ruled albeit, erroneously, that the evidence or information was not material, it was not necessary for the trial court to address these issues. This foreclosed further inquiry into the circumstances. For this reason, it cannot be implied or inferred from the trial court's ruling that the district attorney general and his assistant were exonerated.

Whether the trial court had "more information" than this Court to decide the issues is not indicated by the record. Nor does the State of Tennessee indicate this in its brief. As the late Mr. Justice Henry said in *Dearborne v. State*, 575 S.W.2d 259 (Tenn.1978): "[Appellate Courts] decide cases and controversies on the record as presented to [the court] for ... consideration, and not as they might, or should have been presented." If the State of Tennessee was aware of additional hearings and the taking of evidence that supported the state's theory or shed light upon the issues, the state should have insisted that the missing portions of the proceedings be included in the record submitted to this Court.

The Board of Professional Responsibility of the Supreme Court of Tennessee conducted an inquiry concerning the allegations of misconduct by Lawrence Ray Whitley, the District Attorney General mentioned in the foregoing opinion. The complaint against Mr. Whitley was dismissed.

BIRCH, J., concurs.

SUMMERS, J., concurs with opinion.

SUMMERS, Judge, concurring.

I agree with my colleagues that a new trial is warranted to remove any possible cloud of unfairness or error of prejudicial dimensions. I do believe that we can answer the questions posited by the appellant without the necessity of the accusations of criminal conduct on the part of the prosecutor. The effects of a charge of subornation of perjury are indelible. They last forever.

The trial judge in this case had all the information we had. He denied the motion for a new trial. I believe that in so ruling, the judge inferentially did not find the prosecutor guilty of criminal activity such as the majority asserts. Had he made such findings, the least that he would have done would be to grant a new trial. Furthermore, the trial judge was in a more enviable position than we; he heard the live witnesses at trial and during the motion for a new trial.

I watched the videotape of Apple's statement to the police. I do not find as many things quite as crystal clear as do my brothers of the bench. I saw a man who was familiar with the jailhouse and court system serving a few months for child support issues. He did not have much time left to serve. He did not have a whole lot to bargain away with the district attorney and the police. He was not in much jeopardy as a result of his child support problems. Of course, like anybody else, he wanted out of jail. But I did not see any wonderful deals presented to Mr. Apple that would have prompted him to conjure up a big lie on Spurlock. Based on what I have read and seen, he put himself in a lot more jeopardy by talking and testifying than by serving his child support sentence.

I found nothing exculpatory about Apple's statement on the videotape to the police and district attorney. Frankly, Apple's police statement demolished appellant's theory of nonculpability. I do agree that the prosecutor should have given this information to the defense counsel prior to trial. Had he done so, he could have eliminated many of these present problems. I do not think that counsel's cross-examination of Apple could have been any more thorough or piercing with the videotape; I found few stones unturned by counsel when I read the cross-examination. Spurlock was represented well in this regard.

Lawyers experienced in defending and prosecuting criminal cases may differ in their interpretation of the facts of this record. Some would find the prosecutor's conduct

wrong. Others would simply view the conduct as commensurate with the sporting theory of advocacy. According to legal scholars, such a theory is an anachronism in Tennessee and is dead. As a practical matter, this type of legal combat is still alive in our courtrooms; and it is practiced by both sides—prosecution and defense. More often that not, the trial or appellate courts penalize the state's case when they view the prosecutor as not having complied with the strict discovery rules. Less often is the defense penalized. But, unless the proof in the record actually shows that criminal activity has been committed by one of the advocates, we should refrain from such accusations. We have the benefit of deciding what the advocates should have done months, and sometimes years, after the fact. They, just as trial judges, make instantaneous decisions before, during, and after trial. They may make mistakes. We need to decide if those mistakes are of the mind or of the heart.

For these and other reasons, I concur in the results reached by the majority.

### ORDER DENYING PETITION TO REHEAR

The State of Tennessee has filed a petition to rehear in this case pursuant to Rule 39, Tenn.R.App.P. The state subsequently filed a supplemental petition.

The State contends that:

[T]his Court's opinion relies upon matters of fact or law upon which the parties have not been heard and that are open to reasonable dispute. T.R.A.P. (a)(4). The opinion also overlooks material facts regarding whether Henry Apple had been offered a "deal" by the State. T.R.A.P. (a)(3). In addition, this Court's opinion incorrectly states the material facts established by the evidence and set forth in the record with regard to the information possessed by the State at the time of trial about Robert Coats. T.R.A.P. (a)(1).

The supplemental petition simply adds additional factual allegations.

This Court thoroughly read the record on more than one occasion. The salient portions of the record were reread numerous times. In addition, this Court listened to and laboriously reconstructed the Coarsey tape by playing and replaying each portion of the tape until the colloquy was complete. Consequently, this Court did not overlook any material fact as the State contends. Nor has it overlooked any portion of the law which was thoroughly investigated prior to writing the opinion.

The opinion of this Court was predicated upon the record presented to this Court. The conduct of the prosecution is clearly set forth on the face of the record. The parties were afforded an ample opportunity by the trial court to create a record. Consequently, the parties have been heard; and the facts as well as the law is not open to dispute.

All of the issues addressed fall under the same law umbrella. Also, this Court may recognize plain error on the face of the record especially an error of constitutional dimension. *See* Tenn.R.App.P. 13(b); Tenn. R.Crim.P. 52(b); *State v. Goins,* 705 S.W.2d 648 (Tenn.1986); *State v. Ogle,* 666 S.W.2d 58 (Tenn.1984); *State v. Seagraves,* 837 S.W.2d 615, 617–618 (Tenn.Crim.App.1992); *State v. Maynard,* 629 S.W.2d 911 (Tenn.Crim.App. 1981); *State v. Harless,* 607 S.W.2d 492 (Tenn.Crim.App.1980).

Accordingly, the petition to rehear is denied.

ENTER this 5th day of August, 1993.

/s/ Joe B. Jones
JOE B. JONES
JUDGE

/s/ Adolpho A. Birch, Jr.
ADOLPHO B. BIRCH, Jr.
JUDGE

SUMMERS, Judge, dissenting on Opinion regarding Order denying Petition to rehear.

The State of Tennessee has filed a petition to rehear in this case pursuant to Rule 39 of the Tennessee Rules of Appellate Procedure. My two colleagues on this panel have voted to deny the petition to rehear. I respectfully disagree and would grant the petition.

I think the majority opinion in this case went too far in accusing the district attorney general of subordination of false and perjured testimony. The issue of perjured testi-

mony was not raised below, and the state never really had an opportunity to be heard in this regard. I think we need to re-explore the supposed "deal" made by the state with the witness Apple. Generally, we need to see if our original opinion stated the proper facts as established by the evidence. In sum, I rely upon my remarks in my separate concurring opinion.