# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
May 15, 2001 Session

## STATE OF TENNESSEE v. MICHAEL BLACKBURN

**Direct Appeal from the Circuit Court for Franklin County**
**No. 11,223-B     J. Curtis Smith, Judge**

_____

**No. M2000-01202-CCA-R3-CD - Filed October 19, 2001**
_____

The defendant appeals his convictions for first degree premeditated murder, first degree felony murder, and aggravated robbery.  He contends that (1) insufficient evidence exists to support his convictions; (2) the trial court erred by not allowing into evidence the guilty plea of co-defendant Dickerson; (3) the trial court erred by not allowing into evidence statements made by co-defendant Dickerson; and (4) the trial court erred in ordering consecutive sentences.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Robert S. Peters, Winchester, Tennessee, for the appellant, Michael Blackburn.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; James Michael Taylor, District Attorney General; and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Michael Blackburn, was indicted by the Franklin County Grand Jury on one count of first degree premeditated murder, one count of first degree felony murder, and on one count of aggravated robbery.  After a jury trial, the defendant was found guilty on all three counts.  The trial court merged the two murder convictions and sentenced the defendant to life imprisonment.  On February 9, 1999, the trial court conducted a sentencing hearing for the aggravated robbery conviction.  At the conclusion of the hearing, the trial court sentenced the defendant to twenty years in the Department of Correction consecutive to the life sentence for first degree murder.

The defendant now appeals and contends that (1) insufficient evidence exists to support his convictions; (2) the trial court erred by not allowing into evidence the guilty plea of co-defendant

Dickerson; (3) the trial court erred by not allowing into evidence statements made by co-defendant Dickerson; and (4) the trial court erred in ordering consecutive sentences. After review, we affirm the judgment of the trial court.

**Facts**

At trial, the State called Coffee County Sheriff's Deputy Brian Allen. On August 14, 1996, Deputy Allen was working the midnight shift when the defendant came in around 12:15 a.m. to report a drowning at the Turkey Creek boat ramp. The defendant reported to him that he, co-defendant Tommy Dickerson, and victim David Singer were at the boat ramp that evening. According to the defendant, co-defendant Dickerson and the victim started arguing and co-defendant Dickerson hit the victim in the face, which knocked the victim into the water. He told Deputy Allen that he tried to help the victim, but that co-defendant Dickerson ordered him back into the truck, threatening him that he would be next if he did not comply. He said that the victim never resurfaced. He told Deputy Allen that they then took the victim's truck to Tullahoma. Because the Turkey Creek boat ramp is in Franklin County, Deputy Allen notified the authorities there.

The State called Deputy Earl Morse of the Franklin County Sheriff's Department, who was dispatched to meet the defendant at the boat ramp, to testify. Deputy Morse observed an article of clothing in the water. He testified that the defendant told him that he, Dickerson, and the victim were hanging out around the boat dock when the victim went down on the dock. The defendant claimed that he told Dickerson that he needed to go home because he had to be up early for work. According to the defendant, Dickerson then went onto the dock and began "messing" with the victim. The two began arguing and the defendant said he saw "a motion come around," heard a "smack," and something then hit the water. The defendant said he then turned on the truck headlights.

The defendant further told Deputy Morse that Dickerson said, "He ain't come up yet," and then, "Let's go, he's dead. Get in the truck." The defendant said that when he tried to go in after the victim, Dickerson told him to get in the truck or he would be next. The two then got into the truck and went to Tullahoma. According to the defendant, he jumped out of the truck at a red light and Dickerson tried to run over him. He said that once he got to his father's house, he told him what had happened and his father told him to go to the police.

At the crime scene, the defendant identified a pair of shoes found in the parking lot as belonging to the victim. He also said that Dickerson was his cousin, but he had only met the victim a few days earlier. He further informed the deputy that Dickerson and the victim had run away from a rehab center in Shelbyville. A search of the boat dock revealed a shirt about four feet from the dock, a pair of blue jeans about ten feet from the end of the dock, and the victim's body 15'7" from the end of the dock. The victim's feet were tied with a blanket and his jeans had been pulled down over the blanket. The victim had scratches and abrasions on his face and head.

The autopsy revealed multiple superficial lacerations on the victim's forehead, linear abrasions on his right shoulder, a bruise on his right wrist, and scrapes on his knees and right forearm. The victim had a blood alcohol level of .19%. The medical examiner determined drowning was the cause of the victim's death.

The State also called Franklin County Sheriff's Deputy Danny Warren, who took a statement from the defendant in the early morning hours of August 14, 1996, to testify. The defendant said that Dickerson and the victim had run away from a rehab center on August 12th and had been drinking all day. The defendant met up with Dickerson and the victim around 9:00 p.m. the next evening, August 13, to go to a party at the Traveler's Inn in Manchester. He said that Dickerson and the victim had again been drinking.

The defendant said that when they left, they went to Turkey Creek. Upon arrival, around 9:45 p.m., the victim got out of the truck and went onto the boat dock. The defendant said that he told Dickerson that he needed to get home because he had to be up early for work. He said that Dickerson then got something out of the back of the truck and went onto the dock and told the victim to get up. He said that the two began arguing and then he heard a "smack" and something hit the water. He then turned on the truck headlights and asked Dickerson what was going on. Dickerson replied that the victim was messing around and jumped into the water. He told Deputy Warren that he did not think much of it until Dickerson said that the victim was not coming up. The defendant said that when he offered to jump in after the victim, Dickerson threatened to kill him if he did. He claimed that he was afraid of Dickerson because Dickerson was bigger than him.

According to the defendant, they left Turkey Creek in the victim's truck. He then reiterated his story about stopping at a red light, Dickerson trying to run over him, and getting to his father's house. When questioned about the victim's legs being tied, the defendant claimed he did not know how that happened. He told Deputy Warren that Dickerson and the victim had been arguing earlier because the victim wanted to go home to his family, but Dickerson did not want him to go.

Shortly thereafter, the defendant gave a second statement to Deputy Warren. He told the deputy that Dickerson threatened him if he did not help. So, he tied a blanket around the victim's feet. He said that the victim was conscious, but did not resist them. The defendant claimed that he then blacked out.

Approximately an hour later, the defendant again summoned Deputy Warren with additional facts about the victim's death. He said that when the three were on their way to the boat dock, Dickerson told the defendant that he was going to rob the victim and kill him. The defendant said that when he objected, Dickerson threatened to kill him. He said that when they arrived, Dickerson ordered him to get a blanket and a pair of pants out of the trunk. The defendant then tied the victim's hands together with the pants and tied his feet together with the blanket. According to the defendant, Dickerson tied the blanket tighter, took $15.00 out of the victim's pocket, and then picked the victim up and threw him off the dock. When again questioned about the victim's pants being around his ankles, the defendant persisted that he did not know.

A couple of days later, on August 16, the defendant gave another statement to Deputy Warren. He said that after they arrived at Turkey Creek, the victim got out of the truck and leaned up against it. Dickerson got out, smiled real big, and hit the victim. After the victim hit the ground, Dickerson got on top of him and started beating him saying, "You want to fight? You want to fight?" Although the victim never said a word, he was awake. At one point though, the victim did ask Dickerson why he was doing this. Dickerson just beat him more.

The defendant claimed that Dickerson got a blanket and a pair of pants out of the truck, and made the victim walk down the boat dock. Again, the defendant insisted that he did not want to participate, but that Dickerson threatened him with death if he did not. Per Dickerson's orders, the defendant tied the victim's hands and feet. Then Dickerson smiled big again and pushed the victim off the end of the dock. The defendant told Deputy Warren that the victim came up a couple of times, but that Dickerson would not let him go in to help the victim.

The two returned to Tullahoma and drove to the Traveler's Inn in Manchester. There the defendant met up with his girlfriend Charity Austin and told her that Dickerson killed the victim. She and the defendant left Manchester, drove to his father's house, and then went to the sheriff. The defendant also told Deputy Warren that Dickerson said the victim was rich and that Dickerson told his sister Rhonda that he was about to rob someone, get some money, and leave town.

The State's final witness was Rhonda Smith, the defendant's first cousin and Dickerson's sister. She testified that on August 12th, the defendant, Dickerson, and Charity Austin came to her house around 11:00 p.m. According to Smith, Dickerson had been drinking, but the defendant had not. The defendant told her that he needed money. When she said she did not have any, he told her he was going to get some money one way or another, even if he had to kill someone. In her presence, the defendant asked Dickerson how much money the victim had, and Dickerson told him that he was about to receive $400. The defendant said he would kill the victim for that money. He claimed it would be easy to tie some blocks around his feet and throw him off into the water. While at the Smith's house, the defendant also approached Robert Smith about borrowing a shotgun. He told Smith that he needed to make some money. However, Smith told him that he did not loan out his guns. This concluded the State's proof.

The first witness on behalf of the defendant was James Parker, a.k.a. Poncho. He stated that in August 1996, he lived with the defendant's father, Alfred Blackburn. On August 13th, the defendant, Dickerson and the victim were at Parker's house. Evidently, the victim had spent the night at his house, and was going to turn himself in that morning. However, the victim gave Dickerson $40 and they proceeded to drink all day long.

Around 5:00 p.m., Parker kicked everyone out of his house because they were drinking and he did not want to get in trouble with his landlord. Later, around 9:00 p.m., the defendant and Dickerson returned to Parker's house, but the victim was not with them. They talked with the defendant's father and then they left. When Dickerson and the defendant later returned, Janice

Brown and Charity Austin were with them. The defendant told his father and Parker what had happened, and the defendant and his father then left to go to the police.

The defense also called Janice Brown to testify. She testified that when the defendant arrived at the Traveler's Inn, he seemed scared. He told her that the victim was at the lake. He said he hoped that the victim was just passed out. However, he also told her that he jumped in the water to help the victim and that Dickerson performed CPR, but then pushed the victim back in. After that, she, Charity and the defendant drove out to the landing, called for the victim, and then returned to Parker's to talk with the defendant's father.

Alfred Blackburn, the defendant's father, also testified on behalf of the defendant. He testified that Dickerson and the victim had been drinking all day on August 13th. Dickerson and the victim had argued several times and Dickerson swung a 2x4 piece of lumber at Blackburn when he would not take them to Georgia. Around 11:15 p.m., the defendant came to the house and told him that Dickerson had killed the victim. They then went to the police.

Finally, the defendant testified on his own behalf. At trial, he stated that he did not initially tell police the true story of what happened at the dock because he was afraid his parole would be revoked. He testified that when he, Dickerson and the victim left Poncho's on August 13th, he was driving the victim's truck. They stopped at a market, and Dickerson wanted to drive. Though Dickerson was drunk, and the defendant did not want him to, Dickerson ended up driving anyway. Dickerson indicated that he wanted to go for a swim, so they headed to Turkey Creek. On the way there, Dickerson told him that he was going to kill the victim. Although the victim was sitting in between Dickerson and the defendant, he had no reaction to this statement.

When they arrived at the dock, Dickerson and the victim got out of the truck and leaned up against it. According to the defendant, Dickerson told the defendant to get out or he would do to him what he was going to do to the victim. The defendant noticed a boat in the water and yelled out to it, hoping to dissuade Dickerson, even though he really did not believe Dickerson was serious. But, the boat drove off. Then Dickerson smiled real big, and hit the victim. After the victim hit the ground, Dickerson got on top of him and started beating him saying, "You want to fight? You want to fight?"

Dickerson got the blanket and pants out of the truck. He took the victim down to the dock, told him to lie on his stomach and then ordered the defendant to tie the victim's hands and feet. Again, the defendant maintained that he tried to resist, but Dickerson threatened him with death if he did not help him. The victim asked Dickerson what he was doing, and Dickerson told him he was about to die. Dickerson then pushed the victim off the end of the dock. The defendant testified that he started to go in after the victim, but that Dickerson again threatened him with death if he did.

They left in the victim's truck and drove back to Parker's, where his father was still located. He did not say anything to his father then about what happened because he was scared of Dickerson. He and Dickerson then drove to Manchester and met up with Charity and Janice. After he told

Charity what had happened, he, Charity and Janice went back out to the boat dock to look for the victim. When he did not answer their calls, they drove back to his father's house. He then went to the police with his story.

After hearing all the evidence and closing arguments, the jury returned guilty verdicts for first degree premeditated murder, first degree felony murder committed in the perpetration of aggravated robbery, and aggravated robbery. The trial court merged the two first degree murder convictions into one single conviction and ordered that the defendant serve a life sentence for that conviction. Additionally, the trial court sentenced the defendant to twenty years in the Department of Correction to be served consecutive to the life sentence for first degree murder.

### Analysis

We review challenges to sufficiency of the evidence according to well-settled principles. A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Tuggle, 639 S.W.2d at 914. On appeal, "the [S]tate is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Id. Where sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). This court may not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence." State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). In concluding our evaluation of the convicting evidence, this court is precluded from reweighing or reconsidering the evidence. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996). We also will not reweigh a jury's rejection of a particular defense asserted by a defendant to excuse his conduct. See, e.g., State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978).

The jury convicted the defendant of first degree premeditated murder, first degree felony murder committed during the perpetration of a robbery, and aggravated robbery. In Tennessee, first degree premeditated murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Intentional is defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). A showing of premeditation also requires that the intent to kill be formed prior to the act of killing. Id. However, there is no requirement that a purpose to kill pre-exist in the mind of an accused for any definite period of time. Id.

The elements of premeditation and intent may be established by proof of the circumstances surrounding the killing.  See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).  Several factors that tend to support the existence of these elements include: an unarmed victim; the particular cruelty of the killing; and calmness immediately after the killing.  See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Bland, 958 S.W.2d at 660; State v. Brown, 836 S.W.2d 530, 541-42 (Tenn. 1992); State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).  Existence of these elements are questions to be resolved by the trier of fact.  See Bland, 958 S.W.2d at 660.

In this case, the jury was also allowed to use the theory of criminal responsibility.  A person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."  Tenn. Code Ann. § 39-11-402(2).

The evidence, viewed in a light most favorable to the State, showed that the defendant had previously discussed taking the victim's life in order to get some money from the victim.  Rhonda Smith testified that the day before the victim's death, the defendant told her that he needed some money and was going to get some even if he had to kill someone.  Furthermore, the defendant unsuccessfully tried to procure a weapon from Rhonda Smith's husband.

In his statements to police and during his testimony at trial, the defendant admitted that after Dickerson beat up on the unarmed and intoxicated victim, he and Dickerson bound the victim's arms and legs and threw him into the lake.  He also said that he watched the victim come up twice for air, flailing his arms. The defendant then fled the scene in the victim's truck.  The defendant and Dickerson then drove to the defendant's father's house, where they told no one about what had happened.  The two then drove to a party, where the defendant finally told his girlfriend what happened.  Finally, the defendant drove back to his father's house before going to the authorities.  This clearly showed existence of calmness after this killing.  When viewed in a light most favorable to the State, this evidence was clearly sufficient for a rational trier of fact to find the defendant guilty of first degree premeditated murder either directly or through the use of criminal responsibility.  Although the defendant maintains that he was not guilty because he was forced to participate in these crimes because of co-defendant Dickerson's threats on the defendant's life, the defendant gave several inconsistent versions of the events that led to the victim's death.  Given the defendant's inconsistencies, the jury discredited his testimony and rejected his claim that he was threatened with death if he did not participate in the crimes.  Rejection of such a claim is a question of fact for the jury that this court will not reweigh.  See, e.g., State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978).

The evidence was also sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt of aggravated robbery.  The statutory definition of aggravated robbery is set out in Tennessee Code Annotated section 39-13-402 as follows:
(a) Aggravated robbery is robbery as defined in § 39-13-401:
. . .
(2) Where the victim suffers serious bodily injury.

Robbery as defined in section 39-13-401 is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."

When viewed in a light most favorable to the State, the evidence at trial showed that the defendant previously spoke of his need for money and that he believed the victim had some money. The defendant also told someone that he would do anything to get some money. The defendant testified at trial that after the victim was beaten, co-defendant Dickerson took money from the victim's pocket. Also, the defendant and co-defendant Dickerson then fled the scene in the victim's truck. During the process of this robbery, the defendant and co-defendant beat the victim and inflicted the most serious bodily injury upon him – death. This evidence was clearly sufficient for a jury to find the defendant guilty beyond a reasonable doubt of aggravated robbery either directly or by way of criminal responsibility for the acts of his co-defendant.

The jury also convicted the defendant of first degree felony murder committed in the perpetration of a robbery. Although the trial court merged this conviction with the defendant's conviction for first degree premeditated murder, we conclude that the jury also had sufficient evidence to convict the defendant of first degree felony murder. Under Tennessee law, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). As previously discussed, the evidence was clearly sufficient to find that the defendant killed, or was criminally responsible for killing the victim in the perpetration of a robbery.

Next, the defendant contends that the trial court erred by not allowing into evidence the fact that co-defendant Dickerson pled guilty to second degree murder. The defendant attempted to introduce the co-defendant's judgment of conviction. The defendant's contention is based upon the argument that by the jury not knowing about the co-defendant's guilty plea, they were left to infer that the co-defendant was found guilty of first degree murder, and, thus, the defendant here should also be found guilty. We disagree.

When reviewing a claim involving the trial court's exclusion of evidence, we will not disturb the decision of the trial court absent an abuse of discretion. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). Under Rule 403 of the Tennessee Rules of Evidence, a trial court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Evidence of a co-defendant's guilty plea, no matter the form, must be relevant and pass the Tennessee Rules of Evidence 403 balancing test. In the instant case, we find that the evidence is not relevant and also, Rule 403 of the Tennessee Rules of Evidence requires its exclusion.

A panel of this court was confronted with a similar issue in State v. Eric Chambers, No. W1998-00618-CCA-R3-CD, 2000 WL 279645 (Tenn. Crim. App., filed March 6, 2000, at Jackson). In Chambers, the defendant, relying upon State v. Spurlock, 874 S.W.2d 602 (Tenn. Crim. App.

1993), contended that the trial court abused its discretion by not allowing the defendant to present proof of the co-defendant's guilty plea as evidence supporting his defense. He contended that the evidence should have been admissible to show another's motive to commit the offense, or that another committed the offense. Chambers, 2000 WL 279645, at *4. However, the trial court ruled that such evidence was inadmissible because it was "irrelevant" and "misleading." Id. at *5. In addition, the trial court noted that the defendant had every opportunity to present witnesses to support his theory of the case and could have called the co-defendant to testify. Id. Like the defendant in Chambers, the defendant here was not denied the right to present evidence essential to a defense and could also have called the co-defendant to testify.

Next, the defendant contends that the trial court abused its discretion by refusing to admit evidence of co-defendant Dickerson's statement to James "Poncho" Parker. At trial, the defendant sought to admit Parker's testimony that co-defendant Dickerson told Parker: "Poncho, I killed him. . . . I killed him, Poncho. I killed him." He argued that this statement was admissible under Rule 803(3) of the Tennessee Rules of Evidence. Rule 803(3) allows admission of "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition." The trial court disagreed with the defendant and excluded the statement.

On appeal, however, the defendant now contends that the statement should have been admitted under the excited utterance exception to the hearsay rule. See Tenn. R. Evid. 803(2). A party may not take one position regarding an issue in the trial court and then advocate a different position on appeal to this court. See State v. Dobbins, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988); State v. Brock, 678 S.W.2d 486, 489-90 (Tenn. Crim. App.1984); State v. Galloway, 696 S.W.2d 364, 368 (Tenn. Crim. App.1985); see also Tenn. R. App. P. 36(a). Thus, the different ground for admitting the evidence is waived.

Nevertheless, we will address the defendant's contention on appeal, that Dickerson's statement to "Poncho" Parker was an excited utterance, on its merits. Rule 803(2) provides an exception to the hearsay rule for statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). In the jury-out hearing on the admissibility of the statement, Parker's testimony went as follows:

Q: What did Tommy Dickerson tell you?
A: . . . I said, "Where's David at Tommy?"
He said, "We left him at the game room shooting pool."
And I said, "As drunk as he is?"
And he said, "Yeah." . . . And then Tommy, I was sitting back in the lounge chair, and he said, "Poncho, I know you don't like to be hugged on and everything," but he said, "You might not ever see me again." But Tommy said shit like that all the time. When he whispered it in my ear, he reached down and hugged my neck [and] said, "Poncho" –
Q: Well, by the way, when he reached down, hugged your neck, was he emotional?

A: No, . . . he whispered and he told me, he said, "Poncho, I killed him." He said, "I killed him, Poncho. I killed him."

Dickerson made this statement to Parker after Dickerson and the defendant drove the victim's truck back to town several miles from the location of the killing. As evidenced by Parker's testimony, Dickerson was not in an excited state and even whispered the statements to Parker. Parker testified that Dickerson did not seem emotional, and there is nothing indicating that Dickerson made the statement under the stress of excitement caused by the killing. Thus, Dickerson's statement does not qualify as an excited utterance. See Tenn. R. Evid. 803(2). Furthermore, nothing in the statement related to the declarant's then existing state of mind, emotion, sensation, or physical condition. See Tenn. R. Evid. 803(3). Therefore, the trial court properly denied Parker's testimony relating to Dickerson's statements.

Finally, the defendant contends that the trial court erred in ordering his twenty year sentence for aggravated robbery to be served consecutive to his life sentence for first degree murder. Specifically, he contends that the State failed to show that consecutive sentencing was needed to protect the public against further criminal activity by the defendant. This court's review of the sentence imposed by the trial court is de novo with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). However, if the trial court fails to comply with the statutory directives, there is no presumption of correctness. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). In reviewing the record before us, the trial court in this case clearly followed the appropriate sentencing procedure; therefore, we will review the defendant's sentence with a presumption of correctness.

The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. In conducting our review, we are required, pursuant to Tennessee Code Annotated section 40-35-210, to consider the following factors in sentencing:

> (1) [t]he evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tennessee Code Annotated section 40-35-115(b) provides that a court may order sentences to run consecutively if the court finds by a preponderance of the evidence that

> (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> (2) [t]he defendant is an offender whose record of criminal activity is extensive;

-10-

(3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

See also State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Furthermore, in the event the trial court finds that the defendant is a "dangerous offender," it must also determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

In ordering the sentences to run consecutively, the trial court first found that this defendant had an extensive record of criminal activity. As the record indicates, when the defendant was eighteen years old he was convicted of assault, driving on a revoked license, aggravated burglary, and criminal trespass. At age nineteen, he was convicted of driving on a suspended license, public intoxication, and theft of property over $1,000. At age twenty-one, he was again convicted of theft of property over $1,000. Furthermore, he has violated his parole numerous times. Now, at age twenty-five, he has committed the instant offenses. The record clearly indicates that this defendant has a record of extensive criminal activity. See Tenn. Code Ann. § 40-35-115(b)(2).

The trial court also found that the defendant was a "dangerous offender" whose behavior indicated little or no regard for human life and who had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(4). In applying the factors set out in Wilkerson, 905 S.W.2d at 939, the trial court found that a consecutive sentence was reasonably related to the severity of the aggravated robbery. In so finding, the trial court stated, "[W]e are talking about an aggravated robbery, in which someone lost their life, was murdered. I think that does warrant an extended sentence, because it does reasonably relate to the severity of the offenses committed." The trial court further found that a consecutive sentence was necessary to protect the public from further serious criminal conduct by the defendant. See id. In its findings, the trial court stated, "I think given [the defendant's extensive criminal history] and the facts of this case, a consecutive sentence is necessary to protect the public from further serious criminal conduct by this defendant." See id.

-11-

Our review of the record also indicates that such a sentence is clearly congruent with the principles of sentencing. See id. Considering the trial court's findings, and given the circumstances of this aggravated robbery and the defendant's extensive prior criminal record, we agree with the trial court's conclusion that this defendant was also a "dangerous offender" who had little or no regard for human life. Thus, because the defendant has an extensive prior criminal activity and qualifies as a "dangerous offender," the trial court did not err in ordering the defendant's sentences to run consecutively.

## Conclusion

After thorough review, we hold that sufficient evidence exists to support the defendant's convictions for aggravated robbery and for first degree murder. Furthermore, we hold that the trial court did not err in refusing to allow into evidence the guilty plea of co-defendant Dickerson and in refusing to allow into evidence statements made by co-defendant Dickerson to "Poncho" Parker. Finally, we hold that the trial court did not err in ordering the defendant's sentences to run consecutively. Accordingly, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE