FILED

03/19/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 5, 2023

**STATE OF TENNESSEE v. ANTONIO TURLEY**

**Appeal from the Criminal Court for Shelby County**
**No. 19-03386          Lee V. Coffee, Judge**

_____

**No. W2022-01810-CCA-R3-CD**

_____

A Shelby County jury convicted the Defendant, Antonio Turley, of attempted first degree murder, attempted first degree murder with serious bodily injury, and reckless endangerment with a dangerous weapon. The trial court imposed a total effective sentence of two consecutive life sentences without the possibility of parole. On appeal, the Defendant challenges the admission of certain evidence and the sufficiency of the evidence. He also alleges prosecutorial misconduct. After a thorough review of the record and applicable law, we affirm the trial court's judgments

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and MATTHEW J. WILSON, JJ., joined.

Shae Atkinson (on appeal) and Ann Schiller (at trial), Memphis, Tennessee, for the appellant, Antonio Turley

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Stephen J. Mulroy, District Attorney General; and Meghan Fowler and Jeffrey D. Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's firing shots into a residence belonging to the victims, sisters-in-law Talisa Reid and Angela Webb, while they and their three children were inside. Ms. Webb was in a romantic relationship with the Defendant at the time, and they had been in an argument the night before the shooting, during which the Defendant threatened to shoot Ms. Webb. On the night of the incident, the Defendant fired multiple shots into the victims' apartment, and Ms. Reid was hit in the stomach by a bullet. For this

incident, a Shelby County grand jury indicted the Defendant for attempted first degree murder, attempted first degree murder with serious bodily injury, and reckless endangerment with a dangerous weapon.

## A. Motion in Limine

Prior to trial, the Defendant filed a motion to exclude the admission of statements made by Ms. Webb because she had died before trial from an unrelated cause and therefore was no longer available to testify. Her statements were, he alleged, testimonial in nature. The State responded that Ms. Webb's statements to law enforcement officers at the scene were non-testimonial because they were made during an ongoing emergency while the Defendant was not in custody and still "at large."

The trial court made the following statements in response to the parties' arguments about the admissibility of Ms. Webb's statements:

> [Tennessee Rule of Evidence] 803.2, [] says, "A statement relating to a startling event or condition made while the declarant was under the stress of excitement by the event or condition," in this case, it was said in opening statements that [the Defendant] had left the scene. It took several years for him to be arrested as a result of this. Pictures were shown during opening statements of multiple shots fired through a door of a house.

> And, if these statements are being made by Ms. Webb or somebody else because they had allegedly just been shot at, and those folks were under the stress of excitement caused by this event -- and, again, the alleged person is not present, not at the scene. There's an ongoing investigation. And somebody calls the police and says, "We just got shot at. We're afraid. We're scared," those would be excited utterances, and those are, in fact, hearsay exceptions[.]

> Statements that were made to these folks that showed the effect on the listener as to what they did, why they did it, what they undertook to investigate the case, that is not being offered for the truth of the matter asserted, but under the hearsay exception, the excited utterance is, in fact, substantive proof that the jury, in fact, can consider for the truth of the matter asserted if the state is able to establish the conditions precedent for that excited utterance.

> Hours later, or days later, or weeks later, when a person is at a police station giving a written statement and says, "This is what happened,"

2

obviously that would be . . . hearsay, and that becomes testimonial because, under those circumstances, that becomes an investigation. That becomes preserving proof that could, in fact, be used at a later trial.

. . . .

So, those statements that qualify as excited utterances have been deemed by our courts to be, in fact, non-testimonial. And if the State lays the proper predicate as to the circumstances that those statements were given by Ms. Webb when the police arrived at that investigation, that is, in fact, an exception to hearsay, but any written statements that may have been taken days later, five days later, a week later, that, by definition, becomes testimonial. That is, in fact, being taken for probably further court proceedings, and those written statements would, in fact, be testimonial, and the court would not allow the introduction of written statements that may have been taken days later . . . .

So, I will grant the motion in limine as regards written statements that may have been taken days later, but anything that the State can establish with the proper predicate that was told to police officers in the course of investigation that goes to show the effect that it had on the police officer as to what they did in furtherance of those statements to investigate this case, or shows the proper excited utterance, the Court [] will deny the motion in limine as it regards those two particular issues.

## B. Trial

At trial, the parties presented the following evidence: Georgeterrio Reid testified that Angela Webb was his aunt and her son, Jacquez Butler, was his cousin. Talisa Reid was his mother and Tiarrie Reid was his sister. He recalled that he was nine years old in July of 2012. At that time, Ms. Webb was in a relationship with the Defendant. On July 26, 2012, Mr. Reid was at his grandmother's house with his cousins, and the Defendant got into an argument with Ms. Webb and Talisa Reid. At some point following the argument, Mr. Reid saw the Defendant holding a gun in the front yard of his grandmother's residence. The family dispersed and Mr. Reid, Talisa Reid, Tiarrie Reid, and Jacquez Butler went home to their shared apartment. Ms. Webb arrived at the apartment twenty minutes later. Soon after, Mr. Reid heard a knock on the apartment door. Through the door, Talisa Reid asked who it was, and the Defendant, sounding angry, asked for Ms. Webb to come to the door. Mr. Reid recalled that Ms. Webb was scared and told Talisa Reid not to let the Defendant into the apartment. Thereafter, shots were fired through the apartment's

3

windows and Talisa Reid was shot. Talisa Reid left the scene in an ambulance. Ms. Webb was crying and very upset.

Mr. Reid identified photos of the apartment and three bullet holes in the living room. The family soon moved out of the apartment because they felt frightened.

Jacquez Butler testified that Ms. Webb was his mother and was deceased at the time of trial. On July 26, 2012, Mr. Butler was eleven years old. He testified, consistently with his cousin Mr. Reid, about being at his grandmother's house with family and then being at their apartment when there was shooting. Mr. Butler recalled that Ms. Webb was dating the Defendant and that the Defendant had been at Mr. Butler's grandmother's house earlier in the day. Mr. Butler overheard an argument at his grandmother's house between the adults and the Defendant. Mr. Reid told Mr. Butler he had seen the Defendant get a gun from behind a tree and then the Defendant left.

Back at their apartment, Mr. Butler was playing with his cousins and heard knocking at the door. Talisa Reid told the children to keep quiet, and Mr. Butler heard the Defendant through the door asking for Ms. Webb. Mr. Butler recognized the Defendant's voice because he knew him and had been around him. Ms. Webb told them not to answer the door. Mr. Butler heard the Defendant say something to the effect of, if Ms. Webb was not going to open the door, he would take other action. Seconds later, Mr. Butler heard a gunshot and his mother, Talisa Reid, indicated she had been shot. They all got on the floor while the Defendant continued shooting through the window. Mr. Butler was praying that the Defendant would not kick in the door and come inside to kill them all.

Talisa Reid testified that she had known Ms. Webb for over twenty-five years in 2012 and that they had children the same age and were sisters-in-law. At the time of the shooting, Ms. Webb was dating the Defendant, and, as such, Talisa Reid was friendly with the Defendant and was familiar with him. Talisa Reid testified that Ms. Webb also dated one of the "Griggs brothers," nicknamed "Twin" but was not actively dating "Twin" in July of 2012 because he was in jail. Talisa Reid stated that the Defendant shot her on July 26, 2012. She stated that "Twin," named Marcus Griggs, did not shoot her that night.

Talisa Reid described the events of July 26 and 27, 2012, and stated that earlier in the day on the 26th, she and Ms. Webb met at the Defendant's house and they all went to a family gathering at the home of Becky Webb, who was Talisa Reid's mother-in-law. Talisa Reid testified that, at the family gathering, the Defendant looked upset and said something unkind to Talisa Reid's niece. As a result, Talisa Reid and Ms. Webb "got into it" with the Defendant over what he said. The Defendant told Talisa Reid that he would hurt her. Soon after, Talisa Reid left the gathering with her children and went home. Talisa Reid then spoke with her other sister-in law, Teresa Reid. Teresa Reid was in a relationship

4

with Seth Kelly. Talisa Reid recalled that Mr. Kelly came by her apartment that night, and she asked him to go the store to buy her cigarettes. She stated that Mr. Kelly agreed to go buy the cigarettes for her but did not return.

After Mr. Kelly left, Talisa Reid heard a knock at her door. She testified that it was the Defendant knocking on the door asking for Ms. Webb. Ms. Webb did not want Talisa Reid to answer the door and did not want to speak with the Defendant, and Talisa Reid relayed the message to the Defendant. This exchange continued for approximately thirty minutes, through the closed apartment door, and Talisa Reid could tell the Defendant was becoming angry, so she moved her sofa in front of her door to block him from entry. Soon after, a gunshot came through the door and striking Talisa Reid in the stomach. Talisa Reid recalled that several shots were fired into her apartment, in the living room and her children's room. She later saw bullet holes in her window.

Talisa Reid testified that she knew it was the Defendant at the door who shot her because she recognized his voice. Talisa Reid reiterated that she conversed with him for over twenty minutes while he repeatedly asked for Ms. Webb to come to the door.

On cross-examination, Talisa Reid reiterated that Mr. Kelly had gone to the store for her that night and that he later spoke to police who were called to the scene. She agreed that Mr. Kelly was the brother of Marcus Griggs or "Twin." Talisa Reid had never met Marcus Griggs but knew that Ms. Webb had been in a relationship with him in the past; she stated he was in jail at the time of the shooting. Talisa Reid stated that she spoke to police that night at the hospital but could not recall if it was recorded. Following her release from the hospital, Talisa Reid spoke to the police via telephone but did not give or could not recall giving a formal statement. Talisa Reid recalled that Ms. Webb, prior to her death, was hesitant about cooperating with the investigation because she was scared.

Talisa Reid stated that she was testifying in this matter for the first time during the trial and could not recall being present for or testifying at a preliminary hearing in 2018. She said she had spoken to several people via telephone with regard to this case but had not "stepped in []a courtroom" on a matter related to the Defendant prior to his trial. She denied being subpoenaed to testify other than the one she received for trial. Upon further questioning, Talisa Reid stated several times that she did not recall coming to court for a preliminary hearing.

A hearing was then conducted outside the presence of the jury, during which defense counsel indicated that Talisa Reid had been charged with aggravated assault while the Defendant's case was pending. The charge was later dismissed and thus the trial court stated it would not be admissible. Defense counsel objected.

5

The next day, outside the presence of the jury, defense counsel alerted the trial court that it had reason to believe Talisa Reid had not testified truthfully and had in fact been subpoenaed to testify at the preliminary hearing in this matter. Defense counsel asserted that the State was aware that Talisa Reid may have perjured herself and had notes from the State's discovery file to corroborate the claim, which defense counsel argued constituted a *Brady* violation. The trial court responded that those "notes" in the State's file was work product and non-discoverable. The State further responded that a note in a file that indicated "the victim" in this case has shown up to the preliminary hearing did not establish that Talisa Reid lied on the stand or that the State had knowledge of it. The trial court stated that there was no indication that Talisa Reid had lied to the court or in any other phase of this case.

Testimony resumed in the presence of the jury and Office Marcus Blanton testified that he was employed by the Memphis Police Department ("MPD") and had responded to a shooting call at Talisa Reid's apartment on July 27, 2012. When he arrived, he observed children crying and screaming. Officer Blanton and his partner forced open the apartment door and encountered Talisa Reid, who had been shot.

Lester Hobbs testified that he worked for MPD and responded to a call at 2 a.m. on July 27, 2012, along with three other officers. He encountered Ms. Webb and the children who were screaming and crying. Talisa Reid had already been transported to the hospital. Ms. Webb was upset and said that she had been in an argument with her boyfriend, the Defendant, earlier in the night and that he had threatened to shoot her. She said he had come to their apartment after their argument, and while banging on the apartment door had said "somebody was gonna die" before he began shooting through the window and the door.

On cross-examination, Officer Hobbs agreed that he spoke to Mr. Kelly that night and that he was a witness. On re-direct, Officer Hobbs testified that Mr. Kelly told him that he had heard the Defendant threatening Ms. Webb that night. Defense counsel objected to the officer's testimony about what Mr. Kelly had said, stating that it was hearsay and outside the scope of cross-examination. The State responded that defense counsel had opened the door as to what Mr. Kelly witnessed. The trial court agreed that the question about Mr. Kelly being a witness had opened the door and that the State was allowed to follow up.

Nicole Germain was called to the witness stand by the Defendant, and she testified that she was a prosecutor for the Shelby County District Attorney's Office. She "vaguely" remembered the day in 2017 that the Defendant's case was in the courtroom to which she was assigned. She agreed that the State's file indicated that she had in fact handled the Defendant's preliminary hearing and that the hearing was not held and the charge against

6

the Defendant dismissed. She agreed that he was indicted for aggravated assault at the time but was later indicted with attempted first-degree murder. The case file noted that "the victim" in the case had come to court but had to leave for a family emergency. Ms. Germain noted that she did not remember speaking to "the victim" or Talisa Reid on that day.

Based on this evidence, the jury convicted the Defendant of attempted first-degree murder, attempted first-degree murder with serious bodily injury, and reckless endangerment with a dangerous weapon. The trial court sentenced the Defendant to life in prison for the each of the attempted first-degree murder convictions, to be served consecutively, and a concurrent sentence of fifteen years for the reckless endangerment conviction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the trial court erred when it admitted Ms. Webb's statements to Officer Hobbs pursuant to the excited utterance exception to the hearsay exclusion rule; (2) a *Brady* violation occurred when the State withheld, and the trial court did not require it to be made available, evidence contained in the State's file of Talisa Reid's presence at the preliminary hearing; (3) the trial court erroneously found that Talisa Reid had not committed perjury during her trial testimony; (4) the State committed prosecutorial misconduct by introducing facts not in evidence during its closing argument; (5) the evidence is insufficient to support the Defendant's convictions; (6) the trial court erred when it admitted Mr. Kelly's statement to Officer Hobbs; and (7) the trial court erred when it prevented the Defendant from questioning Talisa Reid about her prior-dismissed aggravated assault charge.

## A. Excited Utterance

The Defendant contends that Ms. Webb's statements, made on the night of the shooting and admitted through Officer Hobbs's testimony, were inadmissible hearsay and should not have been admitted pursuant to the excited utterance exception to the exclusionary rule. He claims there was no specific evidence that Ms. Webb was speaking under stress or excitement from the shooting incident. He concedes that there was evidence presented that Ms. Webb was upset but states there was no clear evidence that she was screaming and crying and, thus, the trial court erred when it admitted the statements into evidence during Officer Hobbs's testimony. The State responds that several witnesses testified that Ms. Webb was upset, and that the evidence showed that her statements were in logical relation to the shocking event of the shooting. The State contends that the trial court did not err when it allowed Officer Hobbs to testify about Ms. Webb's excited utterance. We agree with the State.

7

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Evidence which qualifies as "hearsay" is also excluded from admission at trial. Under Tennessee Rule of Evidence 801, "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "The standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *cert. denied*. The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions – whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule – are questions of law subject to *de novo* review." *Id.* (citations omitted).

Pursuant to Rule of Evidence 803(2), the hearsay rule does not exclude "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). "Underlying the excited utterance exception is the theory that 'circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.'" *State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (quoting *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)). Three requirements must be met for a statement to qualify as an excited utterance:

> The first requirement is a startling event or condition that suspends the normal, reflective thought processes of the declarant. Second, the statement must relate to the startling event or condition. This broad requirement offers considerable leeway such that the statement may describe all or part of the event or condition, or deal with the effect or impact of that

8

event or condition. The third and final requirement dictates that the declarant make the statement while under the stress or excitement from the event or condition. This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*Id.* (footnotes, citations, and internal quotation marks omitted). The excited utterance exception also has a competency requirement where "the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." *Land*, 34 S.W.3d at 529. The "ultimate test" of whether a statement is admissible within the excited utterance exception is "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." *Franklin*, 308 S.W.3d at 823 (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

The Defendant argues that the evidence did not clearly establish that Ms. Webb's statements to Officer Hobbs at the scene of the shooting met the three requirements for the application of the excited utterance hearsay exception. The Defendant notes that Officer Hobbs testified at trial that the children inside the apartment were screaming and crying following the shots being fired into their home, but he never specifically noted that Ms. Webb was screaming or crying. The Defendant concedes that the evidence established that Ms. Webb was "upset." The trial court found that Ms. Webb's statements were made while under the stress of her sister-in-law being shot and while her minor children and family members were present, and that those statements were made under the stress of the event of having shots fired into their home. No clear evidence was presented as to the timing of law enforcement's arrival at the scene; however, the evidence that the occupants were still screaming and crying allows for the inference that they were still under the influence of the event. We conclude that the Defendant's firing a gun repeatedly into Ms. Webb's and Ms. Reid's apartment was a startling event that caused stress or excitement. Ms. Webb's statement to law enforcement about the shooting, made shortly after the shooting, was made while she was still frightened. Ms. Webb was still laboring under the excitement of the shooting and made her statements at a time so near to the shooting as to preclude "the idea of deliberation and fabrication." *Kendrick*, 454 S.W.3d at 478 (quoting *Gordon*, 952 S.W.2d at 820). We, therefore, conclude that the trial court properly found that Ms. Webb's statement was admissible as an excited utterance.

## B. *Brady*

The Defendant next contends that the trial court erred when it found that the State had not committed a violation of *Brady v. Maryland* with regard to its case file from the general sessions court and notes kept by the prosecutor. The Defendant contends that the

prosecutor's notes would have indicated that Ms. Reid did not testify truthfully as to whether Ms. Reid had in fact appeared to testify at the preliminary hearing in this case. He contends that the State did not provide this note prior to trial, and that it was favorable to his defense because it impeached Ms. Reid's credibility. The State responds that the Defendant had access to the note prior to trial pursuant to the State's open-file discovery policy, and thus, because the State did not suppress the evidence, no violation occurred. We agree with the State.

In *Brady v. Maryland*, the United States Supreme Court held, "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as:

> evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Id.* at 56-57 (quoting *Commonwealth v. Ellison*, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). The State has an obligation to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police." *Id.* at 56 (quoting *Strickler v. Green*, 527 U.S. 263, (1999)). Additionally, "The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial." *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (citing *Johnson*, 38 S.W.3d at 56).

A defendant must prove the following four prerequisites in order to establish a violation of due process under *Brady*:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
2. The State must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant must prove a due process violation by a preponderance of the evidence. *Id.* (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

The Tennessee Supreme Court defined "material" within the context of *Brady*:

> Evidence is deemed to be material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." . . . [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."

*Johnson*, 38 S.W.3d at 58 (citations omitted).

The evidence at trial was presented through Ms. Reid's testimony that she had not been subpoenaed and had never testified, or could not remember testifying, in court in the case against the Defendant. Ms. Reid did testify that she had had many conversations about this case but recalled that they occurred over the telephone. A note in the State's file indicated that "the victim" in this case had shown up to the preliminary hearing in general session court and then left.

We conclude that the Defendant has not established all four prerequisites in order to establish a violation of due process under *Brady*. The Defendant has not established that the evidence was not included in the open-file discovery or that the State suppressed the information. Even assuming that the Defendant or one of his attorneys did not receive the information about the prosecutor's notes from the preliminary hearing, and even if the State suppressed that information, the remaining factors have not been established. The Defendant has not established that this evidence was material, in that the State's withholding of this information did not put the entire case in a different light or undermine the confidence in the verdict. *See id.* The Defendant is not entitled to relief on this issue.

## C. Perjury

The Defendant next contends that the State presented Ms. Reid's perjured testimony that she was not present at the preliminary hearing. He again relies on a note in the prosecutor's file, that "the victim" showed up to the preliminary hearing and then left, as grounds for claiming that Ms. Reid lied under oath about her presence that day. He also contends that the State knew her testimony was false. The State responds that, at most,

Ms. Reid's testimony about the preliminary hearing was inconsistent but did not rise to the level of false testimony. We agree with the State.

A conviction obtained by the knowing use of perjured witness testimony violates due process, even if the testimony only bears on witness credibility. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see State v. Spurlock*, 874 S.W.2d 602, 617-18 (Tenn. Crim. App. 1993). The State has a responsibility not to present false testimony and "an affirmative duty to correct false testimony presented by State's witnesses." *State v. Watkins*, No. M2017-01600-CCA-R3-CD, 2019 WL 1370970, at *11 (Tenn. Crim. App. Mar. 26, 2019) (citing *Spurlock*, 874 S.W.2d at 617), *no perm. app. filed.* "In order to prevail on a claim that the State failed to correct false testimony, the defendant must prove the following by a preponderance of the evidence: '(a) that false or perjured testimony was admitted at trial, (b) that the [S]tate either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial.'" *Id.* (quoting *Bell v. State*, No. 03C01-9210-CR-00364, 1995 WL 113420, at *8 (Tenn. Crim. App. Mar. 15, 1995)). If testimony is determined to be false, "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury[.]'" *Giglio v. U.S.* 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271).

Specifically, Ms. Reid was questioned at trial extensively about whether she appeared at the Defendant's preliminary hearing, whether she had received a subpoena to testify at the preliminary hearing, and whether she had given any formal statements or testimony in the Defendant's case. Ms. Reid expressed confusion and an inconsistent recollection as to what had transpired. Defense counsel repeatedly questioned Ms. Reid about all of these inconsistencies or inaccuracies during Ms. Reid's testimony. The fact that Ms. Reid was unclear about her past conduct, does not by itself, establish that she intentionally lied to the jury under oath or that the State knew of any such lies. Accordingly, we conclude that the Defendant failed to prove any of the aforementioned factors by a preponderance of the evidence. He has failed to establish that there was any false or perjured testimony at trial or that the State either knowingly used such testimony or allowed it to go uncorrected. Furthermore, even if we were to conclude that the challenged testimony was false and assume that the State knew of the falsity, the Defendant has not established any reasonable likelihood that the false testimony was material and could have affected the judgment of the jury. The Defendant is not entitled to relief as to this issue.

### D. Prosecutorial Misconduct

The Defendant contends that the State committed prosecutorial misconduct by arguing facts not in evidence during closing argument, to which the Defendant objected. The Defendant alleges that in rebuttal argument, the State argued that it had attempted to

12

locate Seth Kelly to question him about the shooting and that he had evaded their contact after having spoken to the defense team. This "insinuation" by the State, that the defense caused Mr. Kelly to avoid the State's contact, was, the Defendant argues, an improper argument on behalf of the State that warrants reversal of his convictions. The State responds that its argument in rebuttal closing was in response to the Defendant's closing argument that Mr. Kelly was the shooter and that his absence from trial was a reason to discount the State's evidence against the Defendant. The State further responds that, if the prosecutor did argue beyond the facts, the prosecutor's comment was "fleeting" and therefore, harmless. We agree with the State.

"[A]rgument of counsel is a valuable privilege that should not be unduly restricted." *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). Tennessee courts give great latitude to counsel arguing their cases to the jury. *Id.* Thus, "trial judges have wide discretion in controlling the argument of counsel, and their action will not be reviewed absent abuse of that discretion." *Id.* However, the comments of counsel during closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." *State v. Lewter*, No. M2010-01283-CCA-RM-CD, 2011 WL 1197597, at *4 (Tenn. Crim. App., Mar. 31, 2011) (quoting *State v. Gann*, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007)), *no perm. app. filed.*

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008) (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). To establish reversible error and succeed on a claim of prosecutorial misconduct, the appellant must show that "the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." *State v. Farmer*, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)).

When determining whether the argument affected the jury's verdict, we consider the following five factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

13

During the Defendant's closing argument, defense counsel repeatedly questioned Mr. Kelly's absence from trial and why the State had not presented him as a witness. Defense counsel alluded to a theory that Mr. Kelly was on the scene, witnessed the shooting, and possibly was in a gun fight with the Defendant. The State, in rebuttal, argued that attempts had been made to find Mr. Kelly, and that he had evaded the State's contact, to which defense counsel objected. The State presented evidence that multiple witnesses other than Mr. Kelly had identified the Defendant as the shooter. The trial court admonished the jury that arguments of counsel were not evidence, and it also instructed defense counsel that it would allow the State to respond to their assertion about Mr. Kelly's absence from trial. Based on all that transpired, we conclude that the State's rebuttal argument concerning Mr. Kelly was not "so inflammatory" nor was "so improper that it affected the verdict" to the detriment of the Defendant. The Defendant is not entitled to relief as to this issue.

## E. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustains his convictions because there was no physical evidence that he was at Ms. Webb's and Ms. Reid's apartment when the shooting occurred, and because there was no evidence presented that he intended to kill either woman. The State responds that multiple witnesses, familiar with the Defendant, identified his voice through the door of the apartment while he stood outside asking repeatedly for Ms. Webb. The State also points to the threat made by the Defendant that someone would die that night. This, the State contends, is sufficient evidence from which a jury could conclude that the Defendant was the shooter that night and that he intended to harm or kill Ms. Webb or another of the apartment's occupants. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn.

14

2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "strongest legitimate view of the evidence" contained in the record, as well as "all reasonable and legitimate inferences" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant was convicted of attempted first-degree murder and attempted first-degree murder with serious bodily injury. First-degree murder is defined as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). Premeditation requires that the act be "done after the exercise of reflection and judgment" and committed when the accused "was sufficiently free from excitement and passion as to be capable of premeditation." *Id.* at § 39-13-202(e). Our supreme court has provided a

non-exclusive list of factors from which a jury may infer premeditation, including but not limited to a defendant's declarations of an intent to kill. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). Additional evidence from which a jury may infer premeditation is establishment of a motive for the killing. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003).

Criminal attempt occurs when a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). Serious bodily injury is defined as bodily injury that involves (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; (E) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) a broken bone of a child who is twelve years of age or less. *Id.* §§ 39-11-106(a)(34)(A)-(F) (Supp. 2018).

A person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury specifically, by discharging a firearm or antique firearm into a habitation. *Id.* § 39-13-103(a), (b)(3).

We conclude that the evidence, viewed in the light most favorable to the State, was sufficient for a rational trier of fact to find the Defendant's conduct constituted the attempted killing of Ms. Webb, the attempted killing of Ms. Reid from which she suffered serious bodily injury, and reckless endangerment by discharging a firearm into an occupied habitation. The Defendant, Ms. Reid, and Ms. Webb were in an argument earlier in the day about his treatment of their niece. Later that day, the Defendant exchanged words with Ms. Reid through her apartment door for multiple minutes, asking for Ms. Webb to come to the door. This exchange was heard by Mr. Reid's and Ms. Webb's children, and, out of fear, they placed their sofa in front of the door to block entry. Soon after, the Defendant fired multiple shots through the door and into the apartment. From this, a jury could conclude that the Defendant was shooting into the apartment with the intent to kill someone inside. Ms. Reid suffered a gunshot wound to her abdomen and was hospitalized as a result. The Defendant had threatened Ms. Webb and Ms. Reid earlier in the day, and Ms. Reid and the other occupants testified to knowing or being familiar with the Defendant and hearing his voice through the apartment door. This is sufficient evidence from which a jury could find beyond a reasonable doubt that the Defendant was guilty as charged. Accordingly, the Defendant is not entitled to relief on this issue.

### F. Officer Hobbs's Testimony

16

The Defendant next contends that the trial court erred when it allowed Officer Hobbs to testify, on re-direct examination, that Mr. Kelly had given him a statement about the Defendant's threatening Ms. Webb prior to the shooting. He contends that this line of questioning about Mr. Kelly's statement was inadmissible hearsay and also outside the scope of the cross-examination of Officer Hobbs. The State responds that the Defendant opened the door to this line of questioning when he cross-examined Officer Hobbs about his interaction with Mr. Kelly. We agree with the State.

Under Tennessee Rule of Evidence 801, "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." As we have stated herein, evidence which qualifies as "hearsay" is excluded from admission at trial. However, a party may "open the door" to otherwise inadmissible hearsay evidence by introducing evidence or by taking action which causes the previously inadmissible evidence to become admissible. *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). "'[O]pening the door' is an equitable principle that permits a party to remedy the act of another party after a party has opened the door." *State v. Vance*, 596 S.W.3d 229, 250 (Tenn. 2020). The remedy "should be both relevant and proportional," and "the otherwise inadmissible evidence sought to be introduced by the opposing party should be limited to that necessary to correct a misleading advantage created by the evidence that opened the door." *Id.* at 250-51. In other words, a person who opens the door by raising a particular issue at trial "'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." *Gomez*, 367 S.W.3d at 246 (internal citations omitted).

We conclude that the Defendant opened the door to the evidence regarding Mr. Kelly's presence the night of the shooting and whether he told Officer Hobbs that he witnessed the shooting or the circumstances surrounding the incident. When Officer Hobbs replied to a defense question on cross-examination that Mr. Kelly had indeed said he was a witness, the State was then free to ask Officer Hobbs what Mr. Kelly said. The trial court did not err when it concluded that the door had been opened to this testimony. The Defendant is not entitled to relief as to this issue.

### G. Rule 616

Lastly, the Defendant contends that the trial court erred when it limited his questioning of Ms. Reid and her prior charge for aggravated assault, which apparently was pending at the time of the shooting but had been dismissed prior to trial. The aggravated assault charge, he contends, would have shed light on Ms. Reid's lack of credibility and motive to lie. The State responds that the trial court properly prohibited the Defendant from questioning Ms. Reid about the prior charge because it was not pending at the time

17

of trial and therefore did not establish a potential witness bias or motive to lie. We agree with the State.

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000); *State v. Middlebrooks*, 840 S.W.2d 317, 332 (Tenn. 1992). Denial of a defendant's right to effective cross-examination is "constitutional error of the first magnitude" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *see Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination that take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). This court will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. *Dishman*, 915 S.W.2d at 463; *see State v. Fowler*, 373 S.W.2d 460, 466 (Tenn. 1963).

The Tennessee Rules of Evidence define the scope of cross-examination. Rule 611(b) says, "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility, except as provided in paragraph (c)(2) of this rule," with paragraph (c)(2) limiting the scope of cross-examination when a party calls an adverse witness. Tenn. R. Evid. 611(b). In addition, Rule 616 states, "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616. "A defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased." *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001).

The right to cross-examine a witness is also limited to questions that are designed to elicit relevant evidence. Tenn. R. Evid. 401, 402 (providing that "evidence which is not relevant is not admissible"). Evidence is relevant if it tends to prove a material issue. Tenn. R. Evid. 401, Advisory Comm'n Cmts. There are further limitations on the relevant evidence that a defendant may elicit during cross-examination of a witness. Tennessee Rule of Evidence 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This court will not disturb the limits that a trial court has placed upon cross-examination unless the trial court has unreasonably restricted the right. *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001).

18

There is no indication from the record that Ms. Reid had an incentive to testify falsely against the Defendant. She did not testify in exchange for immunity or prosecutorial leniency with regard to the aggravated assault charge, as the charge had long been retired at the time of trial. As such, we cannot conclude that the trial court erred by prohibiting cross-examination about her previously dismissed charges. The Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing, the trial court's judgments are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE